**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DIAMOND SERVICES MANAGEMENT COMPANY LLC and FREDERICK GOLDMAN, INC., | No. 19-cv-07675 |
| Plaintiffs/Counter-Defendants, | Judge John F. Kness |
| v. | |
| C&C JEWELRY MANUFACTURING, INC. and ROBERT G. CONNOLLY, | |
| Defendants/Counter-Plaintiffs. | |

**MEMORANDUM OPINION AND ORDER**

This case involves a familiar refrain in disputes over patent license agreements: Plaintiffs allege breach of contract, and Defendants shoot back that the underlying patent is invalid. In 2011, Plaintiffs, the exclusive licensors of certain patents owned by non-party Trent West (the "West Patents"), entered into an agreement (the "License Agreement" or "Agreement") to license the West Patents to Defendant C&C. Under the terms of the Agreement, Defendant C&C acquired certain rights to make, use, and sell tungsten carbide jewelry rings covered by the West Patents in exchange for royalty payments to Plaintiff Diamond. The Agreement was to expire when the last of the West Patents expired. At the time the parties entered into this Agreement, the last patent was set to expire in 2018. On December 24, 2018, C&C stopped making royalty payments to Plaintiffs.

In January 2019, the United States Patent and Trademark Office ("USPTO"), in response to an anonymously filed request for reexamination, issued a Certificate of Correction on the particular patent at issue; the Certificate had the effect of extending the life of the patent to 2023. That act precipitated this current lawsuit. It is also relevant that the License Agreement arose out of an earlier Settlement Agreement between Defendant C&C and Trent West following patent infringement litigation between those entities over the West Patents.

Plaintiffs filed a three-count complaint against Defendant C&C and its then-president, alleging breach of contract, tortious interference, and violation of the Uniform and Deceptive Trade Practices Act ("UDTPA"). In return, Defendants filed twenty, largely patent-related, counterclaims. Presently pending before the Court are eight fully briefed motions and one objection to a discovery ruling entered by Magistrate Judge Fuentes. For the reasons provided below:

- Defendants' partial motion to dismiss (Dkt. 30) is granted in part and denied in part. The Court lacks personal jurisdiction over Defendant Connolly. Accordingly, Count II against Defendant Connolly is dismissed without prejudice. Defendants' motion to dismiss is denied as to Counts II and III against Defendant C&C.
- Plaintiffs' motion to dismiss Defendants' counterclaims and strike certain affirmative defenses (Dkt. 52) is dismissed as moot in view of Defendants' first amended answers, defenses, and counterclaims (Dkt. 117).
- Defendants' motion to take judicial notice (Dkt. 71) of Plaintiffs' publications is granted in part and denied in part.
- Defendants' motion for leave (Dkt. 148 (under seal); Dkt. 156) to file second amended answers, defenses, and counterclaims is granted.
- Plaintiffs' motion to dismiss all of Defendants' amended counterclaims and to strike certain of C&C's amended affirmative defenses (Dkt. 123) is dismissed as moot in view of Defendants' second amended answers, defenses, and counterclaims.

- ▪ Defendants' motion for an order under Rule 19 of the Federal Rules of Civil Procedure (Dkt. 205 (under seal); Dkt. 208) is denied.
- ▪ Defendants' objections to the Magistrate Judge's ruling (Dkt. 186) are overruled.

## I. BACKGROUND[1]

### A. Relevant Facts

Plaintiff Frederick Goldman Inc. ("Goldman") is a jewelry manufacturing company. (Compl. ¶¶ 2, 14.) Goldman created Plaintiff Diamond Services Management Company, LLC ("Diamond") as a separate legal entity to license tungsten carbide jewelry to third parties. (*Id.* ¶¶ 1, 15.) Goldman is the sole member of Diamond. (*Id.* ¶ 5.) Defendant C&C Jewelry Manufacturing, Inc. ("C&C") is also a jewelry manufacturer. (*Id.* ¶ 3.) At all relevant times, Defendant Robert G. Connolly ("Connolly") was the owner and president of C&C. (*Id.* ¶ 4.)

In 2006, Plaintiffs sued non-party Trent West, challenging the validity of Trent West's patents, including U.S. Patents No. 6,928,734 (the " '734 Patent") and No. 7,032,314 (the " '314 Patent"). (Dkt. 117 at 25.) That same year, the USPTO issued a Certificate of Correction COC (the "2006 COC") that confirmed Trent West's claim of priority dating to September 8, 1998, for the '734 Patent. (*Id.*) In 2007, Plaintiffs entered into a settlement and license agreement with Trent West (the "Diamond/West Agreement") and dismissed their suit. (*Id.*; Compl. ¶ 16; Dkt 148-4 (under seal).) Under the Diamond/West Agreement, Trent West granted Plaintiffs a worldwide exclusive license to sell jewelry manufactured using tungsten carbide

---

[1] Subject-matter jurisdiction over this dispute exists under 28 U.S.C. § 1332. The action involves citizens of different states and the amount in controversy exceeds $75,000.

under certain patented methods, including the West Patents. (Compl. ¶¶ 16–18.) The Diamond/West Agreement also gave Plaintiffs the right to sublicense the West Patents. (*Id.* ¶ 19.)

Defendant C&C entered the picture in 2011 when, following patent infringement litigation between C&C and Trent West, C&C entered into their own settlement agreement with Trent West (the "Settlement Agreement"). (Compl. ¶¶ 23–24; Dkt. 24 (under seal).) Under the Settlement Agreement, C&C agreed to obtain a license from Diamond, Trent West's exclusive licensor for the West Patents. (Compl. ¶ 24.) The Settlement Agreement included a general release of "any and all claims" related to the validity of the West Patents, including the '734 Patent. (Dkt. 24 at 2.) Under the Settlement Agreement, C&C agreed not to challenge or cause to be challenged the validity, enforceability, or scope of the involved patents "or the additional patents in any court or other tribunal," including the USPTO, "except as a counterclaim in a lawsuit, or in a reexamination filed in response to a lawsuit against C&C that includes a claim of infringement of the involved patents or additional patents by C&C[.]" (Dkt. 24 ¶ 7.)

That same year, C&C, "through its president, Connolly," entered into a license agreement with Diamond (the "License Agreement"), which granted C&C a non-exclusive license "to make, use, import, offer for sale, and sell" tungsten carbide jewelry rings covered by the West Patents (the "Licensed Products") to specified customers for a 5% royalty payable to Diamond. (Compl. ¶¶ 25, 32, 53; Dkt. 23 (under seal).) The License Agreement would be in effect "until the date of expiration of the

last to expire of" the '734 or '314 Patents. (Compl. ¶ 35; Dkt. 23 ¶ 5.2.) The License Agreement also included a confidentiality clause, (Compl. ¶ 26; Dkt. 23 ¶ 10), an Illinois choice of law clause (Compl. ¶ 13; Dkt. 23 ¶ 12.1), and a Northern District of Illinois forum selection clause (Compl. ¶ 13; Dkt. 23 ¶ 12.2). When the parties executed the License Agreement, the 2006 COC was in effect. (Dkt. 117 at 28–29.). C&C stopped paying royalties under the License Agreement for the Licensed Products after December 24, 2018. (Compl. ¶ 57.)

According to C&C, Plaintiffs, together with Trent West, have manipulated the claim of priority over time to their benefit. From 2007–2009, Trent West relied on the 2006 COC to prosecute alleged infringers of the West Patents. (Dkt. 117 at 26–27.) But on October 25, 2018, Plaintiffs and Trent West filed a request for another COC, stating that the correct priority date for the '734 Patent was actually five years after September 8, 1998. (Dkt. 117 at 30.) On January 8, 2019, the USPTO issued a COC (the "2018 COC")[2] that vacated the 2006 COC and determined that the '734 Patent's priority date is April 28, 2003—not September 8, 1998. (*Id.* at 31.) The 2018 COC had the effect of extending the life of the '734 Patent from its original October 16, 2018, expiration to August 13, 2023.

According to Plaintiffs, on April 23, 2019, C&C filed a request for another COC to obtain an earlier expiration date for the '734 Patent. (Compl. ¶¶ 43, 45.) The USPTO denied that request on October 3, 2019. (*Id.* ¶ 46.) Plaintiffs also allege that,

---

[2] In their submissions, the parties refer to this COC as the "2018 COC." The USPTO actually issued the COC in 2019, but the Court adopts the parties' convention and refers to the USPTO's ruling as the "2018 COC."

in November 2019, C&C contacted Zales, Jared, and Kay Jewelers to sell or offer for sale the Licensed Products. (*Id.* ¶¶ 58, 62.) Zales, Jared, and Kay Jewelers are Goldman's "main customers for tungsten carbide rings" and "major customer[s]" of Goldman for 30 years. (*Id.* ¶¶ 59, 61, 65.) Zales, Jared, and Kay Jewelers are jewelry retailers that are not included within the authorized customers under the License Agreement and, (*Id.* ¶ 66.) That same month, Jared and Kay Jewelers (collectively, "Kay Jewelers"), decided not to renew their "large program with Goldman for tungsten carbide rings." (*Id.* ¶ 62.)

### B.    Procedural Background

On November 20, 2019, Plaintiffs brought a three-count complaint against Defendants: *first*, Diamond asserts a claim of breach of contract against C&C (Count I); *second*, Goldman asserts a claim of tortious interference against C&C and Connolly (Count II); and *third*, Plaintiffs assert a claim under the UDTPA against C&C (Count III). (*See generally* Compl.) Plaintiffs allege that C&C's failure to pay royalties after December 24, 2018, sale of or offer to sell Licensed Products to unauthorized customers, and filing of requests for a COC with the USPTO breach the License Agreement. Plaintiffs also allege that Connolly tortiously interfered with Plaintiffs' business by deliberately soliciting third parties despite knowing of Goldman's "longstanding business relationship" with those third parties.

In their First Amended Answer, Defendants asserted seventeen[3] affirmative defenses and twenty (largely redundant) counterclaims. Defendants assert the

---

[3] Defendants' first amended answer lists nineteen affirmative defense, but Defendants sixth and thirteenth affirmative defenses are omitted.

affirmative defenses of failure to state a claim, waiver, forfeiture, estoppel, acquiescence, laches, unclean hands, failure to mitigate, covenant of good faith and fair dealing, failure of consideration, noninfringement, invalid contract provision, contract expiration, contract termination, fraudulent concealment, unconscionability, prospective effect of certificate of correction, fraud/mistake, reservation of affirmative defenses, and competitor's privilege. As counterclaims, Defendants assert:

- Fraudulent Inducement/Misrepresentation (Count I)
- Unilateral Mistake Accompanied by Fraud (Count II)
- Unilateral Mistake (Count III)
- Mutual Mistake (Count IV)
- Unilateral Modification of the License Agreement and Lack of Consideration (Count V)
- Termination by Acceptance of Notice (Count VI)
- Breach of the License Agreement by Diamond (Count VII)
- The Claims of the '734 Patent are Invalid (Count VIII)
- Non-Infringement of the '734 Patent (Count IX)
- The '314 Patent is Expired (Count X)
- The '734 Patent is Expired (Count XI)
- The License Agreement is Terminated or Expired (Count XII)
- No Breach of the License Agreement (Count XIII)
- The '734 Patent is Unenforceable Due to Patent Misuse (Count XIV)
- The '734 Patent is Unenforceable Due to Inequitable Conduct and/or Unclean Hands (XV)
- Fraudulent Concealment (XVI)
- Invalid Contract Provisions (Count XVII)
- Unfair Competition under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 and Illinois Common Law (Count XVIII)
- Civil Conspiracy (Count XIX)
- The January 8, 2019, Certificate of Correction of the '734 Patent is Invalid under 35 U.S.C. § 255 (Count XX)

Defendants also move for an order taking judicial notice (Dkt. 71) of Plaintiffs' publications of certain portions of the License and Settlement agreements, both of which Defendants had filed under seal (Dkt. 23 (under seal); Dkt. 24 (under seal)).

On February 12, 2021, the Court referred the case to Magistrate Judge Fuentes for supervision of discovery. (Dkt. 115.) On March 12, 2021, Plaintiffs moved to dismiss Defendants' amended counterclaims and to strike certain amended affirmative defenses. (Dkt. 123.) On May 5, 2021, Defendants moved for leave to file a second amended answer (Dkt. 148 (under seal); Dkt. 156.) Defendants also filed objections to Magistrate Judge Fuentes's discovery order (Dkt. 186) and moved for an order under Rule 19 of the Federal Rules of Civil Procedure that the case may proceed without joining non-party Trent West. (Dkt. 205 (under seal); Dkt. 208.)

Now before the Court are the following motions: (1) Defendants' partial motion to dismiss (Dkt. 30); (2) Plaintiffs' motion[4] to dismiss all of Defendants' amended counterclaims and to strike certain of C&C's amended affirmative defenses (Dkt. 123); (3) Defendants' motion for leave to file a second amended answers, affirmative defenses, and counterclaims (Dkt. 148 (under seal); Dkt. 156); (3) Defendants' motion to take judicial notice of Plaintiffs' publications (Dkt. 71); (4) Defendants' motion "for an order under Rule 19 that it may proceed with its patent-related counterclaims with or without non-party Trent West" (Dkt. 205 (under seal); Dkt. 208); and (5) Defendants' objections to the Magistrate Judge's ruling (Dkt. 186).

---

[4] In view of Defendants' first amended answer (Dkt. 117), Plaintiffs' motion (Dkt. 52) to dismiss Defendants' first-filed counterclaims and affirmative defenses is dismissed as moot.

## II.    LEGAL STANDARD

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Put another way, the complaint must present a "short, plain, and plausible factual narrative that conveys a story that holds together." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022). In evaluating a motion to dismiss, the Court must accept as true the complaint's factual allegations and draw reasonable inferences in the Plaintiff's favor. *Iqbal*, 556 U.S. at 678.

Although a complaint need not allege personal jurisdiction, once a defendant moves to dismiss the complaint under Rule 12(b)(2) for lack of personal jurisdiction, "the plaintiff bears the burden of demonstrating the existence of jurisdiction." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). The Court may resolve the motion without a hearing so long as no facts material to the challenge are in dispute. *Hyatt Intern. Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). In ruling on a motion to dismiss for lack of personal jurisdiction without a hearing, the plaintiff "need only make a prima facie showing of jurisdictional facts." *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010) (citing *Purdue*, 338 F.3d at

782). If the defendant submits affidavits or other evidence in opposition to the exercise of jurisdiction, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue*, 338 F.3d at 783.

## III.   DISCUSSION

### A.   Defendants' Partial Motion to Dismiss (Dkt. 30)

#### a.   The Court Lacks Personal Jurisdiction Over Connolly

Plaintiffs contend that the Court has personal jurisdiction over Connolly for the tortious interference claim (Count II) because, together with C&C, Connolly "systematically conducted business within the State by selling, offering for sale, and marketing goods in the State of Illinois, or otherwise ha[s] engaged, and continue[s] to engage in commerce in the State of Illinois." (Compl. ¶ 11.) Plaintiffs allege that Connolly knew about Goldman's longstanding "business relationship with Zales and Kay Jewelers [and] deliberately targeted Zales and Kay Jewelers for solicitation." (*Id.* ¶ 81.) Plaintiffs also argue that, because Connolly negotiated and signed the License Agreement containing a forum selection clause, Connolly waived his right to contest jurisdiction. (*See* Dkt. 51 at 4–7.)

Federal courts sitting in diversity "must apply the personal jurisdiction rules of the state in which [they] sit." *Kipp v. Ski Enterps. Corp. of Wis.*, 783 F.3d 695, 697 (7th Cir. 2015). Illinois permits its courts to exercise personal jurisdiction up to the limits of the standard for federal due process: that the defendant have sufficient contacts with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Brook v. McCormley*, 873 F.3d

549, 552 (7th Cir. 2017) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); *see* 735 ILCS 5/2-209(c). Accordingly, a single due process inquiry is sufficient. *See Hyatt*, 302 F.3d at 715 ("[T]here is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction").

Two categories of personal jurisdiction exist: general and specific. *Kipp*, 783 F.3d at 697 (citations omitted). General jurisdiction exists when a defendant's contacts with the forum State are "so constant and pervasive as to render it essentially at home in the forum State." *Id.* (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 121 (2014)). Specific jurisdiction exists when the suit "aris[es] out of or [is] related to the defendant's contacts with the forum." *Brook*, 873 F.3d at 549, 552 (7th Cir. 2017). To determine if a suit arises out of a defendant's contacts with the forum, courts must consider (1) whether the defendant has such contacts in the forum state that establish that the defendant should reasonably anticipate being haled into court in the forum State, because the defendant has purposefully availed itself of the privilege of conducting activities there; (2) whether the plaintiff's claims arise out of the defendant's contacts with the forum; and (3) whether the, maintenance of the suit offends traditional notions of fair play and substantial justice. *See NBA Properties, Inc. v. HANWJH*, 46 F.4th 614, 623 (7th Cir. 2022) ("First, the defendant's contacts with the forum state must show that it purposefully availed itself of the privilege of conducting business in the forum state or purposefully directed its activities at the state. Second, the plaintiff's alleged injury must have arisen out of the defendant's

forum-related activities. And, finally, any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice."). A defendant may also waive personal jurisdiction "by signing a forum selection clause." *IFC Credit Corp. v. Aliano Bros. Gen. Contractors, Inc.*, 437 F.3d 606, 610 (7th Cir. 2006). Plaintiffs do not claim that the Court possesses general jurisdiction over Connolly, so the Court considers only specific jurisdiction over Connolly and whether Connolly has waived his right to contest personal jurisdiction by agreeing to a forum selection clause.

### i.    *Specific Jurisdiction*

For the Court to exercise specific jurisdiction over Connolly, Plaintiff must make a prima facia showing that: (1) Connolly has purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the State; (2) Plaintiffs' injury arises from Connolly's forum-related activities; and (3) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012). In the context of intentional torts, "[a]s long as one tortious act is committed in Illinois," the Court may exercise personal jurisdiction over Connolly. *Dental Arts. Lab., Inc. v. Studio 360 The Dental Lab, LLC*, 2010 WL 4877708, at *7 (N.D. Ill. Nov. 23, 2010). In reviewing a motion to dismiss for lack of personal jurisdiction, the Court must accept "all well-pleaded factual allegations in the complaint as true unless

controverted by affidavits outside the pleadings, which the Court may also consider." *Nehmelman v. Penn. Nat. Gaming, Inc.*, 790 F. Supp. 2d 787, 799 (N.D. Ill. 2011).

Plaintiffs refer to Connolly in the Complaint in two separate contexts: *first*, Plaintiffs assert generally that "C&C and Connolly are subject to personal jurisdiction in the State of Illinois because they have systematically conducted business within the State" (Compl. ¶ 11); and *second*, Plaintiffs assert that "C&C, through Connolly" (*id.* ¶ 62), "deliberately targeted" Goldman's "longstanding business" contacts, Zales and Kay Jewelers, and "proceeded to sell, or offer for sale, Licensed Products" to them by "intentionally misrepresenting the enforceability of the Agreement" and validity of the '734 Patent (*id.* ¶¶ 80–84). As a result of the latter alleged activities, Plaintiffs contend that "C&C and Connolly have interfered with Goldman's prospective economic relationships" with those third parties (*id.* ¶ 83), in violation of the License Agreement between C&C and Diamond (*id.* ¶ 25).

To controvert Plaintiffs' allegations, Defendants produce two declarations of Connolly. In the declarations, Connolly attests that he has travelled to Illinois twice, both times to the O'Hare Airport in Chicago for a meeting with Goldman.[5] (*See* Dkt. 61-1; Dkt. 121.) During his first trip on September 27, 2011, Connolly travelled to

---

[5] Defendants attached Connolly's original declaration to their reply brief in support of their Motion to Dismiss. (Dkt. 61-1.) To offer Plaintiffs an opportunity to respond, the Court granted Plaintiff leave to file a Sur-Response. (Dkt. 115.) Defendants also filed a supplemental declaration of Connolly to correct a misstatement in the original declaration concerning Connolly's travel "into or through the State of Illinois." (Dkt. 121) In the original declaration, Connolly attests, *inter alia*, that, since his September 27, 2011, travel to O'Hare to negotiate the terms of the License Agreement, Connolly has not "travelled into or through the State of Illinois." (Dkt. 61-1 ¶ 7.) In the supplemental declaration, Connolly attested that a review of the "electronic communications and records related to [his] business travel . . . refreshed [his] recollection concerning one additional trip to O'Hare" only. (Dkt. 121 ¶ 2.)

O'Hare "in [his] official capacity on behalf of C&C" to negotiate the License Agreement between C&C and Diamond. (Dkt. 61-1 ¶ 6.) The negotiation occurred at an airport terminal and Connolly "never left the airport premises." (*Id.*) Connolly travelled back to O'Hare on May 10, 2013, "for a day meeting with Mr. Goldman [that] lasted only a few hours," to "discuss Mr. Goldman's potential purchase of [Connolly's] business," and where Connolly, again, "never left the airport." (Dkt. 121 ¶ 4–5.) Connolly attests that he has not travelled back to Illinois since May 10, 2013 (*id.* ¶ 6), and that, other than the May 10 meeting (*see* Dkt. 121), he has had no personal contacts with anyone residing in the State of Illinois (*id.* ¶ 8), not contacted anyone located in the State of Illinois other than his attorneys (*id.* ¶ 9), not sold, offered to sell, or otherwise communicated with any customer or retailer in the jewelry business regarding tungsten carbide rings other than in his official capacity on behalf of C&C, and has not done so at all in the State of Illinois since September 27, 2011 (*id.* ¶ 10).

Plaintiffs do not respond to Connolly's declarations, and instead raise, for the first time, that Zales and Kay Jewelers have a "substantial presence in this District and throughout Illinois."[6] (*Compare* Compl. ¶ 88 *with* Dkt. 51 at 7.) Plaintiffs argue that Connolly's solicitation of such third parties thus "wrongfully tampered with Plaintiffs' business relationships in this state." (Dkt. 51 at 7.) According to Plaintiffs, the Court may therefore exercise specific jurisdiction over Connolly because Plaintiffs' injury "arose at least in part from [Connolly's] 'forum-related' activities"— that is, solicitation of third parties with "substantial presence" in Illinois. (Dkt. 51 at

---

[6] Plaintiffs also ask the Court to take judicial notice that Zales and Kay Jewelers have a substantial presence in Illinois. (Dkt. 51 at 2, n.1.)

7 (citing *Felland*, 682 F.3d at 674).) Plaintiffs also argue that, because Connolly did not directly negate the allegation that "C&C and Connolly . . . deliberately targeted Zales and Kay Jewelers for solicitation" (Comp. ¶ 81), such allegation must be admitted as true. (Dkt. 51 at 7.)

As an initial matter, Plaintiffs do not allege in the Complaint that Connolly's improper solicitation of Zales and Kay Jewelers occurred in Illinois or with any other nexus to Illinois. (*See* Compl. Count II.) The only reference in the Complaint to Connolly's contacts with Illinois appears in one paragraph asserting generally that "C&C and Connolly . . . systematically conducted business within the State" (Compl. ¶ 11), which Connolly controverts in his declarations. Plaintiffs "cannot amend [the] complaint via response to a motion to dismiss," and thus benefit from the Court's standard of review of a complaint. *Chicago v. Loyola Univ. Med. Ctr.*, 2011 WL 687334, at *2 (N.D. Ill. Feb. 16, 2011). Although the Court must draw all reasonable inferences in Plaintiffs' favor "unless controverted by affidavits outside the pleadings," *Nehmelman v. Penn. Nat. Gaming, Inc.*, 790 F. Supp. 2d 787, 799 (N.D. Ill. 2011), the Court need not take as true Plaintiffs' arguments and never-pleaded facts.

Even if, as Plaintiffs request, the Court were to take judicial notice that Zales and Kay Jewelers both have a substantial presence in Illinois, Plaintiffs' argument is unpersuasive. In essence, Plaintiffs tether two separate Illinois contacts—their own and that of Zales and Kay Jewelers—and tie them to Connolly on the ground that his alleged improper communications with one injured the other. Plaintiffs do not allege,

however, that Connolly's improper communications occurred in Illinois, involved subject matter in or related to Illinois, or that Connolly otherwise knew "that the effects would be felt" in Illinois.[7] *Felland*, 682 F.3d at 675. Instead, Plaintiffs attempt to use Connolly's relationship with Plaintiffs, and Plaintiffs' relationship with Zales and Kay Jewelers, to establish personal jurisdiction. But Connolly's relationship to the forum state "must arise out of contacts that [Connolly] *himself* creates." *Brook*, 873 F.3d at 552; *see also NBA Properties, Inc.*, 46 F.4th at 624. Connolly's alleged activities, therefore, even if arguably "forum-related," do rise to the level of being "purposefully directed at the forum state." *Felland*, 682 F.3d at 675.

Defendants have produced sufficient evidence in opposition to the exercise of specific jurisdiction over Connolly. *See Purdue*, 338 F.3d at 783. In contrast, Plaintiffs have not gone "beyond the pleadings and submit[ted] affirmative evidence supporting the exercise of jurisdiction." *Id.* Accordingly, Plaintiffs have not established a prima facia case of specific jurisdiction over Connolly. *See Brook*, 873 F.3d at 553.

## ii.   *Waiver of jurisdiction*

Plaintiffs also argue that Connolly waived his right to contest personal jurisdiction by signing the License Agreement containing a forum selection clause. (*See* Dkt. 51 at 4–7.) Plaintiffs concede that Connolly signed the License Agreement

---

[7] Instead, Plaintiffs argue that "[a]t bottom, Connolly was aware that he would be a material witness in Illinois if a dispute arose between the parties over the License Agreement." (Dkt. 122 at 1.) But such awareness does not rise to the level of purposeful availment necessary to establish personal jurisdiction over Connolly. *See Felland*, 682 F.3d at 675.

in his official capacity as an officer of C&C.[8] (*Id.* at 4.) But Plaintiffs nonetheless contend that Connolly is bound by the forum selection clause both as a signatory and as a "closely related" nonparty. (*Id.*)

When a dispute arises out of an agreement that contains a forum selection clause, the contracting parties "agree to personal jurisdiction in that forum." *BouMatic, LLC v. Idento Operations*, BV, 759 F.3d 790, 793 (7th Cir. 2014). A nonparty to the agreement may also be bound by a forum selection clause when the nonparty is "closely related to the dispute." *Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 439 (7th Cir. 2012) (collecting cases). This "vague standard" serves to guard against potential abuses arising from the corporate equivalent of matryoshka dolls, such as "when a forum selection clause is enforced by or against a company that is under common ownership with a party to a contract." *Id.* at 439–442. To that end, the Seventh Circuit has cautioned courts against a "flat rule" favoring a "literal approach to interpreting forum selection clauses." *See id.* at 440–441.

This case is a poor fit for the "closely-related" exception to contract interpretation and enforceability. To begin, the dispute does not "arise out of the contract" as it relates to Connolly. *Adams*, 702 F.3d at 444. Nor do Plaintiffs contend otherwise. (*See* Dkt. 122 at 2 ("Plaintiffs are not seeking to hold Connolly individually

---

[8] Plaintiffs also alleged in the Complaint that C&C, not Connolly, entered into the License Agreement with Diamond. (*See, e.g.*, Compl. ¶ 13 ("Diamond and C&C agreed that the appropriate venue for this contractual dispute is the Northern District of Illinois under Section 12.2 of the subject agreement and that Illinois law applies"); *id.* ¶ 25 ("C&C, through its president, Connolly, entered into a License Agreement"); *id.* ¶ 82 ("C&C"—not Connolly— "is not authorized under the Agreement to sell, or offer for sale, Licensed products to Zales or Kay Jewelers").)

liable for breach of the License Agreement").) Plaintiffs cite to no authority where an individual, acting in his official capacity on behalf of a signatory party, was personally subject to a forum selection clause. To the contrary, where an officer signs an agreement on behalf of a corporation, "and indicates next to his signature his corporate affiliation"—as Connolly did (Dkt. 23 (filed under seal) at 12)—"then[,] absent evidence of contrary intent in the document, the officer is not personally bound.'" *Monco v. Zoltek Corp.*, 2019 WL 952138, at *15 (N.D Ill. Feb. 27, 2019) (quoting *Sullivan v. Cox*, 78 F.3d 322, 326 (7th Cir. 1996)).

Moreover, the undisputed facts material to the jurisdictional question do not implicate the concerns that the closely-related exception was intended to remedy. Connolly is an owner and officer of C&C. (Compl. ¶ 4; Dkt. 61-1 ¶ 3.) On behalf of C&C, Connolly negotiated the Licensing Agreement in Chicago. (Dkt. 61-1 ¶ 6; Dkt. 122 at 1.) Connolly, in his capacity as president of C&C, signed the License Agreement, which contained a forum selection clause designating this Court as a forum. (Dkt. 51 at 4; Dkt. 61-1 ¶ 12.) Plaintiffs name both Connolly and C&C as Defendants in this case and bring all three claims against C&C, but Plaintiffs raise only the tortious interference claim against Connolly. (*See* Compl.) Nothing in the record suggests, nor do Plaintiffs argue, that Connolly is attempting "to avoid the designated forum by manipulating its affiliate relationships." *Adams*, 702 F.3d at 442. Even if, as Plaintiffs emphasize (Dkt. 122 at 1), the contract designated Connolly as the "Licensee" to receive notice under the agreement, *Adams* remains inapposite.

For the foregoing reasons, Plaintiffs may not bind Connolly to a forum selection

clause in a contract to which Connolly is a nonparty to establish personal jurisdiction for, at best, a tangentially-related alleged tort. *See, e.g., John Crane Inc. v. Shein L. Ctr., Ltd.*, 2017 WL 1105490, at *5 n.7 (N.D. Ill. Mar. 23, 2017), *aff'd*, 891 F.3d 692 (7th Cir. 2018) (because a corporation "can only interact through its agents," such "communications do not indicate [that the agent] had minimum contacts with Illinois outside of its interactions with [plaintiff]). Accordingly, Defendants' motion to dismiss Count II against Connolly is granted,[9] and Connolly is dismissed for lack of personal jurisdiction.[10] This dismissal is "necessarily without prejudice." *Lauderdale-El v. Indiana Parole Bd.*, 35 F.4th 572, 576–77 (7th Cir. 2022).

b. <u>Plaintiffs have plausibly alleged tortious interference (Count II) and a UDTPA violation (Count III)</u>

Defendants argue that, because the allegations of tortious interference (Count II) and violation of UDTPA (Count III) sound in fraud, Plaintiffs must, and have failed to, plead with specificity as required under Rule 9(b) of the Federal Rules of Civil Procedure. (Dkt. 31 at 11–14.) At the heart of Counts II and III is Plaintiffs allegation that C&C misled Plaintiffs' customers by misrepresenting the validity of Plaintiffs'

---

[9] Plaintiffs argue that jurisdictional discovery should be permitted for Plaintiffs to develop facts regarding the extent of Connolly's contacts with Illinois relating to the alleged tortious interference and unfair trade practices, as well as for purposes of piercing the corporate veil. (Dkt. 61 at 8 n.6.) Although the Federal Rules allow for liberal discovery, Plaintiffs must, at "a minimum," establish a "colorable or prima facie showing of personal jurisdiction before discovery should be permitted." *Central States, Southeast and Southwest Areas Pension Funds v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000). Because Plaintiffs have failed to establish a geographical nexus between Connolly and the improper communications, even at the pleading stage, Plaintiffs should not be permitted to rummage for facts against Connolly in his personal capacity. *See id.*

[10] Because Connolly is dismissed from the case, the Court will proceed to refer to Defendants' arguments in following motions as those of Defendant C&C only.

patents. (*See* Compl. ¶¶ 78–99.) Plaintiff's tortious interference and UDTPA claims, therefore, sound in fraud and trigger Rule 9(b). *See, e.g.*, *Inter'l Equipment Trading, Ltd. v. Illumina, Inc.*, 312 F.Supp.3d 725, 735 (N.D. Ill. 2018) (tortious interference); *Schwebe v. AGC Flat Glass N. Am., Inc.*, 2013 WL 2151551, at *3 (N.D. Ill. May 16, 2013) (UDTPA). But, contrary to Defendants' argument, Plaintiffs have met the Rule 9(b) pleading standard.

Rule 9(b) prescribes that, in alleging fraud or mistake, a party "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This is a heightened pleading standard that requires more than a plain statement of the claim under Rule 8. Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), the complaint must " 'identi[fy] the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff' [] in detail." *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (quoting *Bakers Trust Co. v. Old Republican Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992)). In other words, the complaint must allege "the who, what, when, where, and how" of the fraudulent conduct. *Medscript Pharmacy, LLC v. My Script, LLC*, 77 F. Supp. 3d 788, 793 (N.D. Ill. 2015) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

To state a claim for tortious interference with prospective economic advantage under Illinois law, Plaintiffs must allege: (1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) an

intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy; and (4) damages resulting from the interference. *Foster v. Principal Life Ins. Co.*, 806 F.3d 967, 971 (7th Cir. 2015). Although Plaintiffs need not plead with "extreme specificity," Plaintiffs must nevertheless identify "an inexact description of the time, place, and content." *Medscript*, 77 F. Supp. 3d at 793. In ruling on a motion to dismiss under similar circumstances, courts in this District have denied motions to dismiss where the complaint includes, at a minimum, an indicium of temporal specificity. *See, e.g.*, *Hefferman*, 467 F.3d at 601 (complaint stated that the time was "late August or early September"); *Inter'l Equipment Trading*, 312 F. Supp. 3d at 735 (complaint identified approximate year); *Medscript*, 77 F. Supp. 3d at 793–94 (complaint stated date and content of representations).

Plaintiffs allege that C&C interfered with Goldman's business by falsely representing to Goldman's longstanding clients that Plaintiffs' West Patents license was invalid and that C&C was authorized to sell products covered by the West Patents. (Compl. ¶¶ 79–87.) As a result, Goldman alleges to have lost profits and business reputation. (*Id.* ¶¶ 88–89.) Specifically, Plaintiffs allege that they learned "[i]n early November 2019" that "C&C had contacted Zales to sell, or offer for sale, tungsten carbide rings that are within the scope of Licensed Products covered" by the License Agreement. (*Id.* ¶ 58.) And in November 2019, Kay Jewelers advised Plaintiffs it would not renew its program with Goldman for tungsten carbide rings. (*Id.* ¶ 60.) Plaintiffs sufficiently allege the when, where, and how of the purposeful

communications. Accordingly, Plaintiffs have sufficiently stated a claim of tortious interference against C&C. *See Hefferman*, 467 F.3d at 601.

C&C also argues that Plaintiffs' UDTPA claim should be dismissed because the complaint fails to state that the alleged misconduct occurred in Illinois. (Dkt. 31 at 13.) To state a claim under UDTPA, Plaintiffs must allege that the "circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Intern'l Equipment Trading*, 312 F. Supp. 3d at 733 (quoting *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853 (Ill. 2005)); *Haught v. Motorola Mobility, Inc.*, 2012 WL 3643831, at *3 (N.D. Ill. Aug. 23, 2012) (applying *Avery* to UDTPA). Although there is "no single formula or bright-line test" for determining whether a transaction occurs within Illinois, the Supreme Court of Illinois considers, among other things, where the contract at issue was executed and the contract's choice-of-law provision. *Avery*, 835 N.E.2d at 854–55. The parties negotiated and signed the License Agreement at issue in Illinois and designated this forum and Illinois law to govern disputes arising from the Agreement. Plaintiffs also alleged that C&C conducts business in Illinois. Accordingly, Plaintiffs have alleged sufficient Illinois nexus at this stage of the proceedings to bring a UDTPA claim against C&C.

*     *     *

For the foregoing reasons, the Court lacks personal jurisdiction over Connolly. Count II against Connolly is therefore dismissed without prejudice. Plaintiffs have, however, sufficiently stated tortious interference and UDTPA claims under Rule 9(b) against C&C. *See Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777–78

(7th Cir. 1994) (noting "fair notice" to defendant is "[p]erhaps the most basic consideration underlying Rule 9(b)"). Accordingly, C&C's motion to dismiss Counts II and III against C&C is denied.[11]

### B.     Judicial Notice (Dkt. 71)

C&C moves the Court (Dkt. 71) to take judicial notice that Plaintiffs "have published confidential terms of the [License and Settlement] Agreement[s]" that C&C has filed under seal (Dkt. 23 (License Agreement); Dkt. 24 (Settlement Agreement)), "and that any later reference of these terms by [C&C] is made necessary by and protected by Plaintiffs' prior publication." (Dkt. 71 at 10.) C&C argues that Plaintiffs have, throughout their pleadings, disclosed material from the License and Settlement Agreements, both of which C&C filed under seal in an effort to comply with the Agreements' respective confidentiality clauses. (*Id.* at 1–2.) C&C's reasons for seeking judicial notice range from legal and "commercial disadvantage [for] not being able to publicly respond to allegations by [Plaintiffs] where [C&C's] response is supported by the text of the [Agreements]" to "avoid[ing] potential reprisals from [Diamond] and third-party Trent West" for "wrongfully disclosed [] contents of either Agreement." (*Id.* at 8–9.)

---

[11] C&C also raises in its Reply brief (for the first time) that Goldman, as the sole shareholder of Diamond, lacks "shareholder standing." (Dkt. 61 at 14–15 (citing *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 757 (7th Cir. 2008) (shareholders lack standing to bring a claim "for indirect harm [they] suffered as a result of an injury to the corporation").) Arguments raised for the first time in a reply brief are generally waived. *Mendez v. Perla Dental*, 646 F.3d 420, 423–24 (7th Cir. 2011). In any event, the suggestion fails: Plaintiffs allege that C&C interfered with Goldman's personal relationship with its customers, causing Goldman to lose profits and business reputation. (Compl. ¶¶ 79, 88–89.) Taking Plaintiffs' allegations as true, Goldman has suffered "a direct, personal injury independent of the derivative injury common to all shareholders." *Rawoof*, 521 F.3d at 757.

Although Plaintiffs oppose the motion, Plaintiffs do not deny that they have included "portions of the License Agreement in the [pleadings]" and "referred to the Settlement Agreement . . . after [C&C] identified it and filed it under seal." (Dkt. 75 at 2–3.) Plaintiffs also respond that they do not object to C&C citing to the License Agreement for purposes of this suit and "did not believe filing any pleadings under seal was necessary." (*Id.* at 2.) As for the Settlement Agreement that Plaintiffs concede to have quoted on the public docket, Plaintiffs contend that, although they are the identified third-party beneficiaries of the Settlement Agreement, Plaintiffs lack the authority to authorize publication of the document. (*Id.* at 2–3.)

Under Rule 201 of the Federal Rules of Evidence, the Court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). The Court may only take judicial notice of a fact that "is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Court's public docket is a source whose accuracy "can be easily confirmed by examining the court's electronic docket." *Skinner v. LVNV Funding, LLC*, 2018 WL 319320, at *2 (N.D. Ill. Jan. 8, 2018). And the existence and substance of the parties' pleadings on the Court's public docket are not in dispute. To the extent, therefore, that C&C seeks judicial notice of the existence and substance of Plaintiffs' pleadings on the public docket—an undisputed and axiomatic reality—the motion is granted.[12]

---

[12] This finding does not affect, nor will it serve to prejudice other potential existing or future rulings of other courts with respect to the interpretation and enforcement of the

But to the extent that C&C seeks judicial notice that any future reference to the Agreements' terms by C&C would be "protected by Plaintiffs' prior publication," (Dkt. 71 at 10), judicial notice is not proper. C&C may not seek to employ judicial notice as a tool to fashion a liability shield for any potential breach of confidentiality claims that Plaintiffs and/or non-party Trent West may assert against C&C in the future. If C&C wishes to move for relief in view of the undisputed violation of the sealing order, which Plaintiffs did not oppose (see Dkt. 20), or otherwise move the Court to amend the sealing order, Defendants are free to do so. Judicial notice, however, is a tool "that must be used with caution," *Daniel v. Cook Cnty.*, 833 F.3d 728, 742 (7th Cir. 2016), not a vehicle by which to obtain what is essentially an advisory opinion. Defendants' motion for judicial notice as to the legal implications of Plaintiffs' publications of the Agreements is thus denied.

### C. C&C's Motion for Leave to File Second Amended Answers, Affirmative Defenses, and Counterclaims (Dkt. 148)

C&C also moves for leave to file second amended answers, defenses, and counterclaims. (Dkt. 148 (under seal).) C&C argues that discovery revealed new information suggesting that the '734 Patent is expired or invalid, Plaintiffs possessed control over the prosecution of the '734 Patent since 2007, and Plaintiffs have previously acknowledged that the '734 Patent was set to expire in 2018. (Dkt. 148 (under seal).) To that end, C&C seeks to amend certain of its affirmative defenses and counterclaims and to add two additional counterclaims: violation of the

---

Settlement Agreement. The Court further notes that Defendants are not seeking sanctions or any other relief beyond the stamp of judicial notice.

California Unfair Competition Law (added to Count XVIII) and interference with prospective economic advantage under California common law (Count XXI). For the following reasons, C&C's motion is granted.

Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, district courts must "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). To amend a pleading after the deadline set in a scheduling order, the moving party must show "good cause." *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542, 553 (7th Cir. 2005) (quoting Fed. R. Civ. P. 16(b)). The Seventh Circuit has made clear, however, that, "[u]nless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend[.]" *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015) (emphasis in original). That said, leave to amend "may be properly denied at the district court's discretion for reasons including undue delay, the movant's bad faith, and undue prejudice to the opposing party." *Crest Hill Land Dev., LLC v. City of Joliet*, 396 F.3d 801, 804 (7th Cir. 2005) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

First, C&C argues that the USPTO's recent decision to reexamine the '734 Patent "necessarily indicates the invalidity" of the 2018 COC to the '734 Patent, and thus confirms that the '734 Patent, and thus the tied License Agreement, expired in December 2018. (Dkt. 148 at 6–8.) On January 21, 2021, after Defendants filed their first amended answer, the USPTO granted "a third part[y's]" request for reexamination of the '734 Patent. (Dkt. 148-3 (under seal).) Although C&C concedes

that "neither the USPTO nor any court ha[d] yet ruled that the 2018 COC is invalid," C&C nonetheless argued that "the decisions of the USPTO [to reexamine the '734 Patent] irreversibly indicate that it is, in fact, invalid." (Dkt. 148 at 8.)

Second, C&C argues that, in April 2021,[13] Plaintiffs produced for the first time the unredacted Diamond/West Agreement, the previously withheld sections of which reveal that Trent West's patent prosecutions of the '734 Patent since 2007 required Plaintiffs' prior approval. (Dkt. 148 at 9–11.) C&C argues that Trent West's repeated claims throughout that litigation about the priority of the '734 Patent being September 8, 1998, consistent with the 2006 COC, were also Plaintiffs' claims. (*Id.* at 10.)

Third, C&C argues that Plaintiffs produced a privilege log on February 26, 2021, that identifies communications between Plaintiffs and Trent West in late 2018 regarding the issues of expiration of the '734 Patent that "directly relate to [C&C's] counterclaim for civil conspiracy." (*Id.* at 12.) Other documents produced by Plaintiffs also include Plaintiffs' discussion and acknowledgment of the expiration of the '734 Patent in 2018. (*Id.*)

Finally, C&C argues that one of its California customers recently refused to purchase tungsten carbide rings from C&C after Goldman communicated threats and misrepresentations concerning the expiration of the '734 Patent to the customer.

---

[13] It is not clear when in April 2021 Plaintiffs produced the unredacted Diamond/West Agreement. In its motion, C&C first states that Plaintiffs produced the unredacted agreement on April 6, 2021 (Dkt. 148 at 3), and later states that C&C "did not receive a complete copy of this document until April 2, 2021" (*Id.* at 6). Regardless of whether Plaintiffs produced the unredacted agreement on April 2 or April 6, both dates fall after February 16, 2021, when C&C filed its first amended answers.

(Dkt. 148 at 12; 148-2 at 89–90.) C&C argues that this information supports its existing unfair competition claim (Count XVIII) and serves as the basis for a new competition-related claim (proposed Count XXI). (*Id.*)

Plaintiffs oppose C&C's motion on the grounds that it is both futile and used solely for dilatory purposes. (Dkt. 161.) Plaintiffs argue that the significance C&C ascribes to the patent reexamination is premature given that the USPTO had yet to issue a final determination. (*Id.* at 6–7.) Plaintiffs also argue that the proposed amendments are immaterial and do not otherwise cure the deficiencies Plaintiffs raise in their motion to dismiss. (*Id.* at 7–14.)

As an initial matter, since C&C filed its motion for leave to amend its answer, the USPTO issued an Office Action in the reexamination proceedings and determined that all the original claims related to the '734 Patent are patentable. (*See* Dkt. 182-1.) The USPTO's Office Action is a final action. (*See id.* at 5.) Upon review of the docket, C&C has not responded to Plaintiffs' filing of the USPTO's final action. Accordingly, and absent any argument to the contrary from C&C, the USPTO's Office Action concerning the '734 Patent moots C&C's argument regarding the favorable significance of the patent reexamination to C&C's motion.

That said, the remainder of C&C's motion raises sufficient "good cause" for the Court to grant leave to amend past the case schedule deadline. *See Trustmark Ins. Co.*, 424 F.3d at 553. The unredacted Diamond/West Agreement was only available to C&C in April 2021, two months after C&C had filed its first amended answer. C&C diligently filed the motion for leave a month later. C&C has also sufficiently explained

how the previously withheld sections of the Agreement support C&C's theory of the case and thus its counterclaims and affirmative defenses.

Plaintiffs do not argue that C&C's proposed amendments cause undue prejudice to Plaintiffs or were made in bad faith. Nor do Plaintiffs explain how, given that fact discovery has yet to close and C&C could not have acquired such information sooner, the proposed amendments would cause undue delay. If, as Plaintiffs argue, C&C's amendments are "immaterial" and buttress only claims that are otherwise "subject to dismissal because they duplicate existing affirmative defenses [and] do not remedy the deficiencies" Plaintiffs raise in their motion to dismiss, then Plaintiffs arguments are better suited to a motion to dismiss. *See Runnion ex rel.*, 786 F.3d at 520 ("Amendment should be refused only if it appears to a certainty that plaintiff cannot state a claim. . . . [I]t is unlikely that the court will be able to determine conclusively on the face of a defective pleading whether [claimant] actually can state a claim." (quoting *Foman*, 371 U.S. at 687)). Accordingly, C&C's motion for leave to file second amended answers is granted.[14]

### D.    C&C's Motion for an Order under Rule 19 that it "Can Assert Its Counterclaims Without Joining Non-Party Trent West" (Dkt. 205)

C&C seeks an order from the Court that "[a]ll necessary parties are already present in this litigation, and there is no need to join [Trent] West to address any issues, including infringement, validity, and enforceability." (*Id.* at 6.) If, however, the Court deems Trent West to be a "necessary party" under Rule 19(a) of the Federal

---

[14] In view of the now operative second amended complaint, Plaintiffs' motion to dismiss (Dkt. 123) the first amended answer is dismissed as moot.

Rules of Civil Procedure, then C&C "requests that the Court[:] (1) order Plaintiffs to join [Trent West] under Rule 19(a)[;] or (2) find [that Trent West] is not an indispensable party and this suit may proceed in its entirety" under Rule 19(b). (*Id.* at 6–7.) C&C argues that the patent-related claims and counterclaims in this case may proceed without Trent West because, under the Diamond/West Agreement, Plaintiffs have "all substantial rights" in the '734 Patent. (Dkt. 220 at 3.) For the following reasons, C&C's motion is denied.

Rule 19(a) of the Federal Rules of Civil Procedure provides for joinder of required parties whose addition to the suit will not deprive the Court of jurisdiction. Fed. R. Civ. P. 19(a); *Davis Companies v. Emerald Casino, Inc.*, 268 F.3d 477, 481 (7th Cir. 2001). Rule 19(b) then sets forth the procedures when joinder is not feasible. *Id.* If a person is a "necessary party" but cannot be joined under Rule 19(b), and no judgment can be structured in their absence, then "the unavailable party is regarded as 'indispensable' and the action is subject to dismissal upon a proper motion under [Rule] 12(b)(7)." *Id.* (quoting *Thomas v. United States*, 189 F.3d 662, 667 (7th Cir. 1999)). The movant under Rule 19 "has the burden to demonstrate that [the Court] should join the absent party if feasible." *CXA Corp. v. Am. Fam. Ins. Co.*, 2016 WL 6582577, at *2 (N.D. Ill. Nov. 7, 2016); *In Re Veluchamy*, 879 F.3d 808, 819 (7th Cir. 2018).

C&C does not seek under Rule 19 to join a non-party, nor does C&C seek under Rule 12(b)(7) to dismiss the case because a necessary and indispensable party cannot be joined. Instead, for the most part, C&C asks the Court to hold that Trent West is

*not* a necessary party under Rule 19(a) and that all necessary parties are already present in the suit. In essence, C&C's motion is a pre-emptive response in opposition to a motion under Rule 19 to join Trent West or any other non-party. At present, though, there is no such motion pending before the Court. C&C's motion, therefore, "seeks a 'definite ruling' on a question that need not now be answered"—namely, whether Trent West is a "required party" under Rule 19. *Bowden v. Kirkland & Ellis LLP*, 254 F.R.D. 542, 543 (N.D. Ill. 2009).

C&C argues that the Court must determine whether all necessary and indispensable parties are present in this case under Rule 19 "to ensure the requirement for statutory standing [on C&C's patent infringement counterclaims] is met."[15] (Dkt. 220 at 2.) C&C relies heavily on a Federal Circuit opinion stating that "the patentee must be joined [if] it is a necessary party" and that "the application of Rule 19 is mandatory . . . and so it applies whether [an opposing party] invokes Rules 12(b)(1), (6), (7), or none of the above." *Lone Star Silicon Innovations, LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1225–38 (Fed. Cir. 2019). Although a party may be added under Rule 19 "on motion or on the [C]ourt's initiative," Fed. R. Civ. P. 19 advisory committee's note to 1966 amendment, C&C's motion raises an issue that is not ripe for resolution; namely, whether C&C has standing to bring its patent infringement counterclaims. That issue can be resolved at a later stage, and C&C may not seek a

---

[15] In their response to C&C's third motion to compel, Plaintiffs argue that C&C's counterclaims challenging to the validity, enforceability, or scope of the West Patents are not properly before the Court for reasons including that Trent West is not a party to suit. (Dkt. 179 at 2–3.) Because the Court has dismissed as moot each of Plaintiffs' motions to dismiss the counterclaims in view of Defendants' first and second amended answers, the Court has not yet had the opportunity to review the viability of C&C's counterclaims.

declaration from the Court in support of a response to a yet-to-be-filed motion. Accordingly, C&C's motion for an order "under Rule 19" is denied.

### E.    C&C's Objections to the Magistrate Judge's Ruling (Dkt. 186)

On February 12, 2021, the Court referred the case to Magistrate Judge Fuentes for supervision of discovery. (Dkt. 115.) As part of that discovery, C&C served Plaintiffs with various interrogatories. Interrogatories 5–12, as propounded by C&C, requested that Plaintiffs: (1) identify which claims of the '734 Patent Plaintiffs allege C&C's products infringe; and (2) state their position on the validity of that claim. (Dkt. 186 at 2–3.) C&C argued that the validity and enforceability of the '734 Patent is a necessary element of Plaintiffs' breach of contract claim. (Dkt. 175 at 5–6.) After Plaintiffs refused to comply, C&C moved to compel Plaintiffs to respond. (Dkt. 174.)

Plaintiffs opposed C&C's motion and repeated their position that this is not patent infringement case. (*See* Dkt. 179.) Plaintiffs argued that proving infringement, or otherwise engaging in claim construction of the '734 Patent, is not necessary to establish breach of contract.[16] (*Id.* at 1–2.) As for C&C's affirmative defenses (and virtually identical counterclaims) that the '734 Patent has already expired, Plaintiffs argued that the '734 Patent is presumed valid and C&C bears the burden to prove otherwise. (*Id.* at 4.)

---

[16] Plaintiffs argue that, based on C&C's course of conduct and the language of the License Agreement, Plaintiffs need not prove infringement to establish a claim of breach of contract. To that end, Plaintiffs argue that the License Agreement, which was the product of the settlement of patent infringement litigation between C&C and Trent West, prevents C&C from challenging the validity of the West Patents. (Dkt. 179 at 1–2.) Plaintiffs contend that C&C's requests for a COC from the USPTO and patent-related counterclaims further establish breach. (*Id.* at 2.) Plaintiffs also contend that C&C ratified the meaning of "Licensed Products" by paying royalties under the License Agreement for over seven years. (*Id.*)

Judge Fuentes denied C&C's motion on the ground of proportionality. Judge Fuentes explained that Interrogatories 5–12 sought substantive answers regarding the '734 Patent's construction, validity, and enforceability, the relevance of which Judge Fuentes found to be "marginal compared to the substantial burdens associated with responding to these interrogatories." (Dkt. 181 at 5.) In reaching this conclusion, Judge Fuentes relied on Section 3.3 of the License Agreement, which outlines dispute resolution procedures when a dispute arises over whether a new product is a Licensed Product. (*Id.*; Compl. ¶¶ 39–40; *see* Dkt. 23 (under seal).) That process culminates in mediation and, if unresolved, a lawsuit. (Dkt. 23 at 5.)

Section 3.3 provides that C&C "shall have the right" to give "Revision Notice" to Plaintiffs if C&C believes that a product is no longer a Licensed Product because claims of the West Patents were "found to be invalid or unenforceable in a Court of Law or have been amended or finally rejected in a Reexamination proceeding before the [USPTO]." (Dkt. 23 at 5.) In the Complaint, Plaintiffs allege C&C did not raise such a dispute and that the claims of the '734 Patent have not been found invalid or unenforceable or amended or rejected in a reexamination proceeding. (Compl. ¶ 38–40.) Although neither party raised Section 3.3 in their briefings on the motion to compel, Judge Fuentes determined that, because this specific dispute resolution process was available to C&C, "the exhaustive patent-related contention discovery sought in 5–12 [were] not proportional to the needs of the case." (Dkt. 181 at 5.)

C&C' has objected to Judge Fuentes's ruling under Rule 72(a) (Dkt. 186) and argues that Judge Fuentes made two legally erroneous conclusions: (1) the discovery

sought was not proportional to the needs of the case because C&C did not provide notice of a dispute under Section 3.3 of the License Agreement; and (2) the patent construction, validity, and enforceability issues are only pertinent to C&C's counterclaims and affirmative defenses, rather than being necessary elements of Plaintiffs' breach of contract claims. C&C also argues that Judge Fuentes's *sua sponte* reliance on Section 3.3 unfairly stripped C&C of the opportunity to offer a substantive reply. To those ends, C&C requests that the Court reverse Judge Fuentes's ruling as to the denial of the discovery sought.

      a.    <u>Legal Standard</u>

Rule 72(a) of the Federal Rules of Civil Procedure governs the review of nondispositive magistrate judge decisions and provides that the Court "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). That is because magistrate judges "enjoy extremely broad discretion in controlling discovery." *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1115 (7th Cir. 2013). Accordingly, the Court may overturn the magistrate judge's ruling "only if the district court is left with the definite and firm conviction that a mistake has been made." *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 943 (7th Cir. 1997). Put another way, "the district judge reviews magistrate-judge discovery decisions for clear error." *Domanus v. Lewicki*, 742 F.3d 290, 295 (7th Cir. 2014).

b.   Discussion

Parties may obtain discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b). But "[o]n motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules . . . if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).

Plaintiffs' breach of contract claim involves, as Judge Fuentes observed in a different order, "significant patent overlap" with questions about "infringement (and likely validity or invalidity) [being] unquestionably intertwined with the claims and defenses in this case." (Dkt. 133 at 3–4.) That said, and despite the potential relevance of sought discovery by C&C, district judges—and magistrate judges to whom discovery is assigned—have "substantial discretion to curtail the expense and intrusiveness of discovery" to the needs of the case. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003) (internal quotations omitted).

Judge Fuentes did not err in relying *sua sponte* on Section 3.3 of the License Agreement. C&C disagrees with Judge Fuentes's reading of Section 3.3 and argues that the "Revision Notice" is neither mandatory nor applicable to the dispute at issue.

(Dkt. 186 at 4–5.) C&C also argues that, because neither party relied on Section 3.3 in their briefs on the third motion to compel, C&C had no notice that Judge Fuentes would consider Section 3.3. (*Id.* at 6.) But Judge's Fuentes's reliance on Section 3.3— a presumptively bargained-for term in the License Agreement that is at the heart of this case—does not give this Court the "firm conviction that a mistake has been made." *Weeks*, 126 F.3d at 943; *see* Fed. R. Civ. P. 26(b)(2)(C). Nor does Judge Fuentes's reading of Section 3.3, which governs disputes over Licensed Products, constitute clear error. *See Domanus*, 742 F.3d at 295.

Judge Fuentes's conclusion that infringement is not a necessary element of Plaintiffs' breach of contract claim was likewise sound. Despite the webbed nature of the breach of a License Agreement claim and the issue of infringement, Plaintiffs may nonetheless prevail on their breach claim without proving infringement. Put differently, proving infringement may be sufficient, but it is not necessary, to establish breach of the License Agreement. Information relating to the construction, validity, and enforceability of the '734 Patent—the substance of Interrogatories 5– 12—would only be necessary for the patent-related counterclaims, to the extent such claims survive the motion-to-dismiss stage. Because the Court has not yet had an opportunity to determine the viability of C&C's counterclaims, and in view of the comprehensive discovery sought by Interrogatories 5–12, Judge Fuentes's call to deny

C&C's motion "on the proportionality side of Rule 26(b)(1)" does not amount to an error of law. *See Jones*, 737 F.3d at 1115.

For the foregoing reasons, Judge Fuentes's conclusion that Interrogatories 5–12 were not proportional to the needs of the case in view of Section 3.3 of the License Agreement was neither "clearly erroneous" nor "contrary to law." *Hassebrock v. Bernhoft*, 815 F.3d 334, 340 (7th Cir. 2016). Accordingly, C&C's objections are overruled.

## IV. CONCLUSION

Defendants' partial motion to dismiss (Dkt. 30) is granted in part and denied in part (Defendants' motion is granted as to Count II against Defendant Connolly and denied as to Counts II and III against C&C); Plaintiffs' motion to dismiss (Dkt. 52) is dismissed as moot; Defendants' motion to take judicial notice (Dkt. 71) is granted in part and denied in part; Defendants' motion for leave to file second amended answers, defenses, and counterclaims (Dkt. 148 (under seal); Dkt. 156) is granted; Plaintiffs' motion to dismiss the first amended complaint (Dkt. 123) is dismissed as moot; Defendants' motion for an order under Rule 19 (Dkt. 205 (under seal); Dkt. 208) is denied; and Defendants' objections to Magistrate Judge Fuentes's discovery ruling (Dkt. 186) are overruled.

SO ORDERED in No. 19-cv-07675.

Date: September 26, 2022

JOHN F. KNESS
United States District Judge