**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DIAMOND SERVICES MANAGEMENT COMPANY LLC and FREDERICK GOLDMAN, INC., Plaintiffs, v. C&C JEWELRY MANUFACTURING, INC., Defendant. | No. 19 C 7675<br>Judge John F. Kness |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Diamond Services Management Company LLC and Frederick Goldman, Inc., sued Defendant C&C Jewelry Manufacturing, Inc., over Defendant's alleged breach of a patent-license agreement and related conduct involving U.S. Patent No. 6,928,734. Defendant moves for partial summary judgment on Plaintiffs' breach-of-contract and Uniform Deceptive Trade Practices Act ("UDTPA") claims (Counts I and III, respectively), and Plaintiffs move to dismiss Defendant's counterclaims. (Dkt. 258; Dkt. 285; Dkt. 303.) For the reasons below, the Court holds that the License Agreement terminated on December 24, 2018, when the '734 Patent expired under the certificate then in effect. Defendant is therefore entitled to summary judgment on the royalty-payment and unauthorized-sales theories of Plaintiffs' contract claim in Count I, while judgment on Plaintiffs' certificate-of-correction theory is deferred pending discovery under Rule 56(d). As for Count III,

Plaintiffs' UDTPA claim is dismissed without prejudice because the expiration of the patent and License Agreement leaves no live claim for injunctive relief. Finally, Plaintiffs' motion to dismiss Defendant's counterclaims is granted in part and denied in part.

## I. BACKGROUND

Although the Court has been over much of the background of this case in earlier opinions, *see* Dkt. 224; Dkt. 226, the facts are complicated, have since developed, and therefore warrant a brief discussion.

Plaintiff Frederick Goldman, Inc. ("Goldman") is a jewelry manufacturing company. (Dkt. 1 ¶¶ 2, 14.) Goldman created Plaintiff Diamond Services Management Company LLC ("Diamond") as a separate legal entity to license tungsten carbide jewelry to third parties. (*Id.* ¶¶ 1, 15.) Goldman is the sole member of Diamond. (*Id.* ¶ 5.) Defendant C&C Jewelry Manufacturing, Inc., is also a jewelry manufacturer. (*Id.* ¶ 3.)

In 2006, Plaintiffs sued non-party Trent West, challenging the validity of Trent West's patents, including U.S. Patents No. 6,928,734 (the " '734 Patent") and No. 7,032,314 (the " '314 Patent"). (Dkt. 265 ¶¶ 35–37.) That same year, the United States Patent and Trademark Office ("USPTO") issued a Certificate of Correction (COC) (the "2006 COC") that confirmed Trent West's claim of priority dating to September 8, 1998, for the '734 Patent. (Dkt. 272 ¶ 5.) In 2007, Plaintiffs entered into a settlement and license agreement with Trent West (the "Diamond/West Agreement") and dismissed their suit. (Dkt. 148-4 (under seal).) Under the Diamond/West Agreement,

Trent West granted Plaintiffs a worldwide exclusive license to sell jewelry manufactured using tungsten carbide under certain patented methods, including the West patents. (Dkt. 260 ¶¶ 37–38 (under seal).) The Diamond/West Agreement also gave Plaintiffs the right to sublicense the West patents. (*Id.*)

Defendant C&C entered the picture in 2011 when, after patent infringement litigation between Defendant and Trent West (Dkt. 265 ¶ 44), Defendant entered into its own settlement agreement with Trent West (the "Settlement Agreement"). (*Id.* ¶ 9; Dkt. 24 (under seal).) Under the Settlement Agreement, Defendant agreed to obtain a license from Diamond, Trent West's exclusive licensor for the West patents. (Dkt. 24 ¶ 6.) The Settlement Agreement included a general release of "any and all claims" related to the validity of the West patents, including the '734 Patent.[1] (*Id.*¶ 5.) Under the Settlement Agreement, Defendant agreed not to challenge or cause to be challenged the validity, enforceability, or scope of the involved patents "or the additional patents in any court or other tribunal," including the USPTO, "except as a counterclaim in a lawsuit, or in a reexamination filed in response to a lawsuit against [Defendant] that includes a claim of infringement of the involved patents or additional patents by [Defendant]." (*Id.* ¶ 7 (under seal).)

That same year, Defendant entered into a license agreement (the "License Agreement") with Diamond, which granted Defendant a nonexclusive license "to make, use, import, offer for sale, and sell" tungsten carbide jewelry rings covered by the West patents (the "Licensed Products") to specified customers. (Dkt. 23 (under

[1] Defendant argues that this general release clause is operative only for claims that were raised, or could have been raised, in the original lawsuit.

seal).) The License Agreement would be in effect "until the date of expiration of the last to expire of" the '734 or '314 Patents. (*Id.* ¶ 5.2.) The License Agreement also included an Illinois choice of law clause (*id.* ¶ 12.1) and a Northern District of Illinois forum selection clause (*id.* ¶ 12.2). When the parties executed the License Agreement, the 2006 COC was in effect. (Dkt. 272 ¶¶ 20–21.)

Defendant stopped paying royalties under the License Agreement for the Licensed Products after December 24, 2018. (Dkt. 288 ¶ 64.) According to Defendant, Plaintiffs, together with Trent West, have manipulated the claim of priority over time to their benefit. (Dkt. 283 at 26–28.) From 2007 to 2009, Trent West relied on the 2006 COC to prosecute alleged infringers of the West patents. (*Id.* ¶¶ 13–35.) But on October 25, 2018, Plaintiffs and Trent West filed a request for another COC, stating that the correct priority date for the '734 Patent was actually five years later than September 8, 1998. (*Id.* ¶¶ 77–79.) On January 8, 2019, the USPTO issued a COC (the "2018 COC") that vacated the 2006 COC and determined that the '734 Patent's priority date is April 28, 2003—not September 8, 1998. (*Id.* ¶ 83.) In Plaintiffs' view, the 2018 COC had the effect of extending the life of the '734 Patent from its original October 16, 2018 expiration to August 13, 2023. (Dkt. 271 at 6.)

According to Plaintiffs, on April 23, 2019, Defendant filed a request for another COC to obtain an earlier expiration date for the '734 Patent. (Dkt. 271 at 6.) The USPTO denied that request on October 3, 2019. (*Id.*) Plaintiffs also allege that, in November 2019, Defendant contacted Zales, Jared, and Kay Jewelers to sell or offer for sale the Licensed Products. (Dkt. 319 ¶¶ 20, 23.) Zales, Jared, and Kay Jewelers

are Goldman's "main customers for tungsten carbide rings" and "major customer[s]" of Goldman for 30 years. (Dkt. 1 ¶¶ 59, 61, 65.) Zales, Jared, and Kay Jewelers are jewelry retailers that are not included as authorized customers under the License Agreement. (Dkt. 319 ¶ 19.) That same month, Jared and Kay Jewelers decided not to renew their "large program with Goldman for tungsten carbide rings." (Dkt. 1 ¶ 62.)

*Procedural Background*

Plaintiffs brought a three-count complaint against Defendant: breach of contract (Count I); tortious interference (Count II); and a claim under the UDTPA (Count III). (Dkt. 1.) Plaintiffs allege that Defendant's failure to pay royalties after December 24, 2018; sale of (or offer to sell) Licensed Products to unauthorized customers; and filing of requests for a COC with the USPTO breached the License Agreement. Plaintiffs also allege that Defendant tortiously interfered with Plaintiffs' business by deliberately soliciting third parties despite knowing of Goldman's "longstanding business relationship" with those third parties.

In Defendant's third amended answer, Defendant asserted nine affirmative defenses and ten counterclaims. (Dkt. 283 (sealed).) Defendant asserts affirmative defenses of estoppel, laches, unclean hands, unilateral modification, noninfringement, invalid contract provision, contract termination/expiration, fraudulent concealment, and competitor's privilege. As counterclaims, Defendants assert:

- Fraudulent Inducement/Misrepresentation (Count I);
- Unilateral Mistake (Count II);

- Mutual Mistake (Count III);
- Breach of the License Agreement by Diamond (Count IV);
- The Claims of the '734 Patent Are Invalid (Count V);
- Non-Infringement of the '734 Patent (Count VI);
- The '734 Patent Is Unenforceable Due to Inequitable Conduct and/or Unclean Hands (VII);
- The January 8, 2019, Certificate of Correction of the '734 Patent Is Invalid Under 35 U.S.C. § 255 (Count IX);
- Interference with Prospective Economic Advantage (California Common Law) (Count X).

On February 12, 2021, the Court referred the case to Magistrate Judge Fuentes for supervision of discovery. (Dkt. 115.) Plaintiffs moved to dismiss Defendant's amended counterclaims and to strike certain amended affirmative defenses. Defendant, for its part, filed a partial motion to dismiss Robert G. Connolly ("Connolly")[2]—the owner and president of C&C—for lack of personal jurisdiction and also sought leave to file an amended complaint. (Dkt. 123.) Agreeing with Defendant, the Court dismissed Connolly without prejudice and granted Defendant C&C leave to file a second amended complaint. (Dkt. 226.)

After further motion practice, and before the close of discovery, Defendant filed the operative third amended answer and counterclaims (Dkt. 283 (sealed)) and moved for partial summary judgment (Dkt. 258 (sealed)) on Count I of Plaintiffs' complaint. Plaintiffs then moved to dismiss Defendant's third amended counterclaims. (Dkt. 285.) Magistrate Judge Fuentes stayed discovery in view of the flurry of dispositive motion briefing. (Dkt. 266.) With discovery stayed, and the motions remaining under advisement, the '734 Patent expired in 2023. (Dkt. 319 ¶ 18.) Defendant thereafter moved for partial summary judgment on Count III of Plaintiff's complaint. (Dkt. 303.)

[2] Plaintiff initially brought suit against Connolly alleging tortious interference (Count II).

Now before the Court are Defendant's motions for partial summary judgment on Counts I and III of Plaintiff's complaint, as well as Plaintiffs' motion to dismiss Defendant's third amended counterclaims.

## II. STANDARD OF REVIEW

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted).

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Each complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Put another way, the complaint must present a "short, plain, and plausible factual narrative that conveys a story that holds together." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022) (cleaned up). As the Seventh Circuit has emphasized, a plaintiff need not "lay out every element or ingredient" of a claim to survive a Rule 12(b)(6) motion. *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1336 (7th Cir. 2024). Such "details and proof" come later, and all a plaintiff must do is "state a grievance." *Id.* at 1338. In evaluating a motion to dismiss, the Court must accept as true the complaint's factual allegations and draw reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. But even though factual allegations are entitled to the assumption of truth, mere legal conclusions are not. *Id.* at 678–79.

## III. DISCUSSION

The parties' motions present two principal sets of issues. First, Defendant's summary-judgment motions require the Court to determine when the License Agreement terminated and whether Plaintiffs are entitled to any cognizable relief under the UDTPA. Second, Plaintiffs' motion to dismiss requires the Court to determine which of Defendant's counterclaims are barred by the parties' no-challenge and general-release provisions, rendered moot by termination of the License Agreement, or adequately pleaded. Defendant's motions will be addressed first, followed by Plaintiffs' motion.

### A. Defendant's Motions for Summary Judgment

Defendant seeks summary judgment on Counts I and III of Plaintiffs' complaint. As to Count I, because the License Agreement terminated on December 24, 2018, the Court grants judgment on Plaintiffs' royalty-payment and unauthorized-sales theories. But as permitted under Rule 56(d), the Court defers judgment on the certificate-of-correction theory. As to Count III, because Plaintiffs can no longer obtain the injunctive relief available under the UDTPA, Count III is dismissed without prejudice as moot, and Defendant's motion for summary judgment on Count III is therefore dismissed.

#### *1. Count I*

Count I in Plaintiffs' complaint sets forth three separate allegations for breach of the 2011 License Agreement: (1) Defendant refused to pay royalties after December 24, 2018 (Allegation One); (2) Defendant made improper sales to nonapproved customers after December 24, 2018 (Allegation Two); and (3) Defendant participated in the filing of the unsuccessful April 23, 2019 Request for Certificate of Correction of the '734 Patent (Allegation Three). (Dkt. 1 ¶¶ 47–77.)

Defendant moves for summary judgment on each allegation. In Defendant's view, the 2011 License Agreement terminated on December 24, 2018 (the initial expiration date for the '734 Patent), so Plaintiff has no claim for breach of contract on Allegations One and Two. (Dkt. 259 at 6.) As for Allegation Three, Defendant admits that the provision survives any termination of the contract. But Defendant contends that Plaintiffs have produced no evidence to support their allegation that Defendant

participated in the filing of the certificate of correction. (*Id.*)

Plaintiffs argue that the 2011 License Agreement did not terminate until August 13, 2023 because, before December 24, 2018, Plaintiffs had filed a certificate of correction amending the initial priority date. (Dkt. 271 at 8–13.) And although the certificate of correction did not issue until January 8, 2019, Plaintiffs argue that the liminal period between December 24, 2018 and January 8, 2019 did not automatically terminate the contract. (*Id.*) As to Allegation Three, Plaintiffs flag that the current stay in discovery is central to the issue and therefore ask this Court to defer ruling on Defendant's motion under Rule 56(d) of the Federal Rules of Civil Procedure. (*Id.* at 8–11.)

Each argument is addressed in turn. But in overview, Defendant's motion for summary judgment is granted as to Allegations One and Two because the contract automatically terminated on December 24, 2018. Allegation Three is differently situated. Plaintiff is correct that summary judgment would be improper considering the current stay in discovery. Under Rule 56(d), this Court will therefore defer judgment on Allegation Three until the close of discovery.

a. Defendants Are Entitled to Summary Judgment on Allegations One and Two

The License Agreement contains the following termination clause: "this Agreement shall . . . continue until the date of expiration of the last to expire of U.S. Patent Nos. 6,928,734 or 7,032,314." (Dkt. 272 ¶ 10.)

Plaintiffs do not dispute that, upon expiration of the patent, the License Agreement automatically expires. (Dkt. 271 at 8–13.) Plaintiffs also do not dispute

that the License Agreement is not revivable and thus was not revived. (*Id.*) Rather, their main contentions are that: (1) December 24, 2018 was not a predefined expiration date in the contract; and (2) "date of expiration" refers to the natural life of the patent, rather than a momentary lapse between a previous expiration date and later issued certificates of correction that extended that date of expiration post hoc. (*Id.*)

Defendant, for its part, does not dispute that December 24, 2018 is not explicitly stated in the License Agreement. (Dkt. 276 at 3–10.) Defendant instead homes in on the fact that the original expiration date, based on the priority date of the patent, was December 24, 2018; by the License Agreement's terms, therefore, when December 24 passed, the patent expired alongside the License Agreement. (*Id.*) In Defendant's view, a later issued certificate of correction is effective only as of the date of issuance and therefore can have no retroactive effect on the '734 Patent's validity between December 24 and January 9. (*Id.*)

Principles of contract interpretation in Illinois require courts to consider what a reasonable person in the other party's position would conclude. *Land of Lincoln Goodwill Indus., Inc. v. PNC Fin. Servs. Grp.*, 762 F.3d 673, 679 (7th Cir. 2014). Because the disputed provision contains a term of art from patent law—namely, a "date of expiration"—the Court must consider what that term meant in customary usage at the time of contract formation. In other words, both the plain meaning and the statutory background of patent law must be considered to understand what the "date of expiration" is and to effectuate the parties' intent.

A patent ordinarily has a lifespan of 20 years from its priority date before it expires. 35 U.S.C. § 154(a)(2), (b). But a priority date is not static. Patent owners can file for a certificate of correction when they believe that the priority date is inaccurate. 35 U.S.C. § 255. And if the priority date changes, the date of expiration changes with it. But this change of priority date is only reflected on the patent as "originally issued" for "causes arising after the PTO issues a certificate of correction." *Sw. Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1294 (Fed. Cir. 2000). On the converse, and "[b]y necessary implication, for causes arising before its issuance, the certificate of correction is not effective." *Id.* at 1295.

As applied to this case, the certificate of correction does not reflect on the '734 Patent as "originally issued" for the period preceding January 9, 2019. In other words, the '734 Patent expired on December 24, 2018 because the COC that was issued on January 9, 2019 did not alter the patent's legal effect for causes arising before the COC was issued—that is, before January 9, 2019. And because the License Agreement automatically terminates upon expiration of the '734 Patent,[3] the License Agreement terminated alongside the '734 Patent on December 24, 2018.

Plaintiffs attempt to distinguish *Southwest Software* by arguing that the case addressed only when a patent owner may bring a cause of action for "patent infringement." But that is an unreasonably narrow reading of the case. As the Federal

[3] For purposes of this motion, the parties treat the '734 Patent as the last to expire of the two patents identified in the License Agreement. (Dkt. 264 at 12.)

Circuit explained[4] in interpreting a statute concerning certificates of correction:

> Section 254 provides that "[a] printed copy [of the certificate of correction] shall be attached to each printed copy of the patent, and such certificate shall be considered as part of the original patent." 35 U.S.C. § 254. It also provides that "[e]very such patent, together with such certificate, shall have the same effect and operation in law on the trial of actions *for causes thereafter arising* as if the same had been originally issued in such corrected form." *Id.* (emphasis added).

*Sw. Software*, 226 F.3d at 1294–95 (alterations in original). In *Southwest Software*, the plaintiff argued that construing the statute to apply certificates of correction only prospectively would "nullif[y] or render[] surplusage the words 'such certificate shall be considered part of the original patent.'" *Id.* at 1295. That language, however, was not nullified because it "plays the role of establishing that, *for all circumstances* in which the certificate of correction is effective—namely, at all times *after its issue date*—the certificate is considered *part of the original patent*." *Id.* (emphasis added). Adopting the plaintiff's construction would, in the Federal Circuit's view, lead to "illogical and unworkable result[s]." *Id.* This is because "[u]ntil the PTO issues a certificate of correction . . . , such a claim would appear invalid to the public, and reasonable competitors would be justified in conducting their affairs accordingly." *Id.*

Moreover, the relevant provision here (Section 255) addresses mistakes made

[4] Although the case primarily concerned 35 U.S.C. § 254 rather than § 255 (the relevant provision here), both provisions contain nearly identical language and address the operation in law of certificates of correction. That said, Section 254 addresses mistakes made by the PTO, while Section 255 addresses mistakes made by the applicant. To that end, Section 254 includes the following language missing from Section 255: "A printed copy thereof shall be attached to each printed copy of the patent, and such certificate shall be considered as part of the original patent." 35 U.S.C. §§ 254, 255.

by the applicant, rather than by the PTO, and therefore omits the language, "such certificate shall be considered part of the original patent." This omission reflects that the drafters of Section 255 afforded even less retroactive effect for a certificate of correction when the mistake is made by the applicant, rather than the PTO. *Sw. Software*, 226 F.3d at 1296–97 (suggesting the language in Section 255 provided even less ameliorative power than Section 254).

Plaintiffs nonetheless maintain that the " 'date of expiration,' as stated in the 2011 License Agreement, is directly correlated with Plaintiffs' rights to the '734 Patent." (Dkt. 271 at 14.) For this proposition, Plaintiffs cite *BJM, Inc. v. Melport Corp.*, 18 F. Supp. 2d 704, 707 (W.D. Ky. 1998). In *BJM*, the parties had entered into a licensing agreement that terminated when "the last of the Patents expires." *Id.* Before the patents' expiration, however, a federal statute was passed that extended the enforceable term of the patent. *Id.* In deciding whether the license agreement terminated upon the initial or later expiration date of the patent, the district court held that "both the peculiarities of the patent licensing context and the language of the particular agreement itself suggests an intent to allow the actual life span of the patents to determine the termination date of the License Agreement." *Id.* Plaintiffs argue that the license agreement in *BJM* is "similarly provided" here and that the Court should adopt the same reasoning. (Dkt. 271 at 13.)

*BJM* does not control the outcome here. A crucial difference is that, in *BJM*, the patent had not expired before the change in federal law that extended the term of the patent. It is undisputed that the certificate of correction here was issued after

December 24, 2018: the initial expiration date of the patent. If anything, *BJM* supports a result contrary to that urged by Plaintiffs. Of particular relevance is the intent of the parties when drafting the License Agreement (keeping in mind "both the peculiarities of the patent licensing context and the language of the particular agreement itself."). *BJM*, 18 F. Supp. 2d at 707. As Plaintiffs admit, the " 'date of expiration,' as stated in the 2011 License Agreement, is directly correlated with Plaintiffs' rights to the '734 Patent." (Dkt. 271 at 14.) But as the Federal Circuit held in *Southwest Software*, a certificate of correction has no retroactive effect. *Sw. Software*, 226 F.3d at 1296–97. That decision, which was issued in 2000, was a matter of public record at the time the License Agreement was executed. *Id.* (case decided in 2000). Against this backdrop, finding that the License Agreement terminated on December 24, 2018—a holding that does not depend on the resolution of disputed material facts—reflects the parties' intent "to allow the actual life span of the patents to determine the termination date of the License Agreement." *BJM*, 18 F. Supp. 2d at 707. For these reasons, therefore, Defendant is entitled to summary judgment as to Allegations One and Two.

#### b. Consideration of Allegation Three Is Deferred Under Rule 56(d)

In Allegation Three of Count I, Plaintiffs allege that Defendant "breached the express terms of the 2011 License Agreement by participating in the [unsuccessful] filing of the April 23, 2019 Request for Certificate of Correction of the '734 Patent." (Dkt. 271 at 9; Dkt. 1 ¶ 67.) That request was filed anonymously and alleged that the PTO erred in granting Plaintiffs' request for an extension of the '734 Patent. (Dkt.

272 ¶ 16.) Neither party disputes that the provision at issue in Allegation Three survives termination of the 2011 License Agreement. (Dkt. 259 at 16.) But Defendant argues that Plaintiffs have produced no evidence that Defendant participated in the filing of the Request for Certificate of Correction. (*Id.* at 17.)

Plaintiffs ask this Court to defer judgment on Allegation Three under Rule 56(d) of the Federal Rules of Civil Procedure, considering that Magistrate Judge Fuentes (to whom the case was referred) imposed a stay of discovery before Plaintiffs could take any depositions of Defendant's witnesses. (Dkt. 266.) Plaintiffs seek to depose Connolly, the owner and president of C&C. As Plaintiffs note, in the order permitting jurisdictional discovery of Connolly, Magistrate Judge Fuentes recognized that Connolly's "carefully worded" affidavit that he did not "actively assist[] in the preparation or filing of any request for certificate of correction" raised the question whether he did "something else to cause or prompt the re-examination of the [']734 [P]atent." (Dkt. 170 at 6.)

Plaintiffs correctly contend that summary judgment should be deferred pending further discovery. Judge Fuentes stayed discovery until after this Court ruled on Plaintiffs' motion to dismiss Defendant's counterclaims

> not because the dispositive motions raise any "threshold" issue that ought to be decided before discovery, but rather because a stay pending resolution of this particular motion to dismiss would tend to simplify the issues, reduce the litigation burden on the parties and the court, and avoid a tactical disadvantage to defendants, in that defendants have raised a cognizable concern that absent a stay, plaintiffs would be allowed to engage in "full blown discovery" on their claims, while defendant C&C "must wait to engage in discovery on its counterclaims."

(Dkt. 266 (citations omitted).) Defendant argues deferring summary judgment under Rule 56(d) would allow Plaintiffs to pursue an improper "fishing expedition" regarding Connolly.[5] (Dkt. 279 at 17.) But Defendant cannot use the stay of discovery as both a sword and a shield. Plaintiffs' motion to dismiss being addressed below, Defendant can no longer argue that Plaintiffs have a tactical disadvantage. Discovery may be pursued by both parties on their remaining claims, including Allegation Three of Count I.[6] Defendant's motion for summary judgment on Allegation Three of Count I is therefore deferred pending additional discovery.

*2. Count III*

Plaintiffs' Count III alleges that Defendant, in violation of the Uniform Deceptive Trade Practices Act ("UDTPA"), made misrepresentations to actual and potential customers concerning the enforceability of the 2011 License Agreement when selling allegedly prohibited products. Plaintiffs' complaint requests an

[5] Defendant also argues that Plaintiffs' Rule 56(d) argument is procedurally improper because Plaintiffs merely filed an affidavit with no accompanying motion. (Dkt. 276 at 15–16 (citing *Bigger v. Facebook, Inc.*, 375 F. Supp. 3d 1007, 1013–14 (N.D. Ill. 2019)) ("The Seventh Circuit has made clear that Rule 56(d) requires a motion.").) Defendant's argument, however, fails because discovery was stayed by this Court pending resolution of dispositive motions. *Deere & Co. v. Ohio Gear*, 462 F.3d 701, 707 (7th Cir. 2006) (court should not have granted "summary judgment on the basis of procedural default" for failure to file a Rule 56(f) (now Rule 56(d)) motion when a court's own handling of "accumulated discovery motions" created the inability to oppose summary judgment).

[6] Plaintiff contends that denial of summary judgment on Allegation Three should warrant denial on Allegations One and Two because "it would be improper to enter judgment on only part of the breach of contract claim (Count I)." (Dkt. 271 at 11 n.4 (first citing *Biggins v. Oltmer Iron Works*, 154 F.2d 214, 216 (7th Cir. 1946); and then citing *Arado v. Gen. Fire Extinguisher Corp.*, 626 F. Supp. 506, 508–09 (N.D. Ill. 1985) ("piecemealing" or "issue-narrowing" of a single claim under Rule 56 is prohibited)).) But Plaintiffs' cited authorities precede a 2010 amendment to Rule 56 that permits summary judgment on "part[s] of each claim or defense." Fed. R. Civ. P. 56(a); *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 849 (7th Cir. 2019).

injunction to prevent "the sale [by Defendant] of the Licensed Products to non-Customers." (Dkt. 1 at 16.) Plaintiffs also requested any "further relief as the Court deems just and proper." (*Id.*)

It is undisputed that Plaintiffs' requested injunctive relief (to stop Defendant from selling allegedly prohibited products) is no longer available because neither the '734 Patent nor the 2011 License Agreement is enforceable. (Dkt. 318 at 7–10.) Plaintiffs nonetheless argue that a live dispute remains as to any "further relief . . . the Court deems just and proper." (*Id.* at 10.) Plaintiffs now suggest they seek further unspecified equitable relief against Defendant because of "ongoing damage" to "customer relationships, goodwill, and business reputation" caused by Defendant's alleged misrepresentations of the invalidity of the 2011 License Agreement and '734 Patent. (*Id.* at 11–12 (citing *Morton Grove Pharms., Inc. v. Nat'l Pediculosis Ass'n, Inc.*, 525 F. Supp. 2d 1039, 1049 (N.D. Ill. 2007) (denying motion to dismiss because plaintiff could state a claim under the UDPTA for injunctive relief based on "reputational injury" and "diminished goodwill")).)

Although judicial authority to fashion equitable relief is broad, it remains Plaintiffs' burden to establish ongoing irreparable harm. *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1272 (7th Cir. 1995); *see also* 815 ILCS 510/3 ("A person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable."). Plaintiffs adequately pleaded a UDTPA violation based on allegations that Defendant "falsely represent[ed] to [Plaintiffs'] longstanding clients that Plaintiffs' [License Agreement] was invalid and

that [Defendant] was authorized to sell products covered by the ['734 Patent]." (Dkt. 226 at 21.) These allegations rested on Defendant's conduct after December 24, 2018. (Dkt. 318 at 10–11 ("For nearly four years from the time Plaintiffs filed the Complaint on November 20, 2019 until the expiration of the '734 Patent on August 13, 2023, [Defendant] has misrepresented the scope of the 2011 License Agreement and the enforceability of the '734 Patent to multiple customers.").)

Plaintiffs' allegations therefore assumed the enforceability of the License Agreement during that time after December 24, 2018. This assumption can no longer be taken as true in view of the holding above that the 2011 License Agreement terminated on December 24, 2018. Plaintiffs' allegations that Defendant misrepresented the enforceability of the 2011 License Agreement must therefore be dismissed.

This does not end the analysis, however, because Plaintiffs further alleged that Defendant "misrepresented the validity and enforceability of the ['734 Patent]" to solicit Plaintiffs' customers. (Dkt. 1 ¶ 96–97.) And unlike the License Agreement, the '734 Patent did not terminate until August 13, 2023. Plaintiffs' allegations of misrepresentations as to the '734 Patent are therefore not rendered implausible by the present ruling.

It is unclear what equitable remedies Plaintiffs seek from this Court. On one hand, Plaintiffs appear to invoke the broad equitable powers that courts retain "in the absence of a clear and valid legislative command." (Dkt. 318 at 13.) *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). On the other hand, Plaintiffs have

narrowed their analysis and discussion of equitable remedies to an injunction. (Dkt. 318 at 13.) But Plaintiff is nonetheless foreclosed from relief in both cases.

To the extent Plaintiffs seek equitable relief other than an injunction, that cannot be issued because Illinois courts have interpreted the UDTPA as a clear and valid legislative command to allow injunctions as the only remedy. *See, e.g.*, *Vara v. Polatsek*, 2012 IL App (1st) 112504-U, ¶ 82 (citing 815 ILCS 510/3) ("[T]he only remedy under the UDTPA is injunctive relief."). As for injunctive relief, Plaintiffs have failed to meet their burden at summary judgment that they continue to suffer ongoing irreparable harm. This is because Plaintiffs admit their evidence of harm precedes the expiration of the '734 Patent on August 13, 2023. (Dkt. 318 at 10 (arguing that Defendant made misrepresentations "until the expiration of the [']734 [P]atent on August 13, 2023").)

With no evidence of ongoing harm, Plaintiffs are left to speculate that discovery will reveal more misrepresentations. (Dkt. 318 at 11.) But as Defendant notes, instead of filing a Rule 56(d) motion or affidavit to defer a ruling on Count III, Plaintiffs decided to face summary judgment on the current record.[7] And even if this Court afforded Plaintiffs further discovery, it would likely be futile: Plaintiffs' protectible rights terminated alongside the patent on August 13, 2023. *See Orion Sales, Inc. v. Emerson Radio Corp.*, 148 F.3d 840, 842 (7th Cir. 1998) (preliminary

[7] Plaintiffs argue that denial for Count III is warranted given the stay on discovery. (Dkt. 318 at 11.) Yet Plaintiffs do not cite Rule 56(d) at all, so the argument is waived. *See Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005) (finding waiver because party "did not present legal arguments or cite relevant authority to substantiate claim"). Waiver aside, Plaintiffs did not file a Rule 56(d) affidavit, which is fatal to their argument. *See Korf v. Ball State Univ.*, 726 F.2d 1222, 1230 (7th Cir. 1984).

injunction arising from a license agreement became "patently moot" when the license agreement expired by its own terms); *Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 596 (7th Cir. 2006) ("once the threat of the act sought to be enjoined dissipates, the suit must be dismissed as moot"); *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1550 (Fed. Cir. 1994) ("expiration of [the] patents precludes the grant of injunctive relief").

Plaintiffs are therefore left without any remedy to vindicate alleged violations of the UDTPA. Accordingly, this Court has no jurisdiction to hear Plaintiffs' claim. *See Brown*, 442 F.3d at 596(dismissal is warranted under Article III when the sought injunctive relief becomes moot). Accordingly, Count III is dismissed without prejudice, and Defendant's motion for summary judgment as to Count III is therefore dismissed.

### B. Plaintiffs' Motion to Dismiss Defendant's Counterclaims

Defendant's third amended answer sets forth ten counterclaims against Plaintiffs. (Dkt. 283.) In the interest of clarity, those theories of relief can be summarized as follows: Counts I, II, and III seek a declaration that the License Agreement is not enforceable due to fraud and mistake of fact. Count IV asserts breach of contract under the License Agreement for actions taken by the Plaintiffs after December 24, 2018. Counts V, VI, VII, and IX seek a declaration that, in effect, the '734 Patent is invalid and nonenforceable, and that Defendant's sale of tungsten carbide rings after December 24, 2018 is noninfringing. Finally, Counts VIII and X assert that Plaintiffs harmed Defendant by wrongfully representing to Defendant's

customers and the market that only Plaintiffs had the ability to sell tungsten carbide rings.

Plaintiffs seek dismissal on numerous grounds, mostly related to the Settlement and License Agreements. (Dkt. 285 at 2.) As for Counts I, II, III, V, VI, VII, and IX, Plaintiffs argue that the "no-challenge" clauses in the Settlement Agreement and the License Agreement bar Defendant from bringing these claims. Plaintiffs also point to a "General Release" provision that purportedly prohibits Defendant from bringing the patent-related counterclaims: Counts II, III, V, VI, VII. Plaintiffs also raise some other claim-specific arguments that are not covered by these provisions.

In view of this Court's holding that the License Agreement terminated on December 24, 2018, Counts I, II, III, and IV of Defendant's counterclaims are dismissed without prejudice as moot.

1. *The No-Challenge Clause Is Inapplicable to the Counterclaims (Counts I, II, III, V, VI, VII, IX)*

Plaintiffs argue that the "no-challenge" clauses in the Settlement Agreement and the License Agreement render counterclaims in Counts I, II, III, V, VI, VII, and IX subject to dismissal. The clause, which is the same in both Agreements, states:

> Except as a counterclaim in a lawsuit, or in a reexamination filed in response to a lawsuit against Licensee that includes a claim of infringement of the Licensed Patents by Licensee, Licensee, including its representatives and agents, agrees not to (a) challenge or cause to be challenged, the validity, enforceability or scope of the Licensor Patents in any court or other tribunal, including the United States Patent and Trademark Office, or (b) attempt to invalidate, assert the unenforceability of, request reexamination of, or oppose (collectively, "Attack") any of the Licensor Patents, either alone or in association with any other Person, or otherwise assist any other Person with respect to a

challenge of any of the Licensor Patents...

(Dkt. 272 ¶ 12.) Under both Agreements, Defendant can challenge the ’734 Patent only by two distinct mechanisms: “as a counterclaim in a lawsuit, or in a reexamination filed in response to a lawsuit against [Defendant] that includes a claim of infringement of the Licensed Patents by [Defendant].” Plaintiffs’ principal argument is that “lawsuit” in the phrase “as a counterclaim in a lawsuit” is modified by the words “that includes a claim of infringement of the [involved patents or additional patents by Defendant].” (Dkt. 286 at 11.) And because Plaintiffs sued Defendant for breach of the License Agreement, rather than for patent infringement, Plaintiffs maintain that the counterclaim exception does not apply. Defendant, for its part, argues that basic tenets of grammar, word choice, and sentence structure indicate that the language “as a counterclaim in a lawsuit” stands alone and that “lawsuit” is not modified by the words “that includes a claim of infringement.”

Defendant has the better argument. The primary objective in construing a contract is to give effect to the parties’ intent. *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). A court looks initially to the language of the contract because the language, given its plain and ordinary meaning, is the best indication of the parties’ intent. *Id.* If the language is susceptible to multiple meanings, it is ambiguous, and the court then may consider extrinsic evidence to determine the parties’ intent. *Id.*

The no-challenge clause is not ambiguous. (Dkt. 272 ¶ 11 (both parties agree that the contract language is unambiguous).) The relative clause, “that includes a claim of infringement of the Licensed Patents by Licensee,” modifies “lawsuit” only

in the phrase, "in a reexamination filed in response to a lawsuit against Licensee" (Phrase 2); that relative clause does not modify "lawsuit" in the phrase, "as a counterclaim in a lawsuit" (Phrase 1). A comma separates Phrase 2 from Phrase 1, and there is no comma immediately before the relative clause at issue (i.e., between "lawsuit against Licensee," and "that includes a claim of infringement"), so that relative clause does not reach back beyond the extant comma to modify Phrase 1. *See Ferris v. Blucora, Inc. Key Leadership Change of Control Severance Plan*, 736 F. Supp. 3d 506, 517 (E.D. Tex. 2024); *see also Advincula v. United Blood Servs.*, 678 N.E.2d 1009, 1022 (Ill. 1996) ("Significantly, there is no punctuation setting this qualifying phrase apart from the sentence which precedes it, which might connote that the phrase was intended to modify more remote terms.").

In short, the plain language of the License Agreement unambiguously establishes that Defendant's counterclaims are permitted "as a counterclaim in a lawsuit." The provision at issue was negotiated and agreed upon by the Plaintiffs with the aid of competent counsel. (Dkt. 272 ¶ 9.) Contrary to Plaintiffs' suggestions, it is also reasonable to infer that the negotiated "no-challenge" provision took into account that any lawsuit brought against Defendant by the Plaintiff would be in the form of a breach of the License Agreement rather than a patent infringement suit.

*2. The General Release Clause Is Applicable to Counterclaims That Arose on or Before November 14, 2011*

The General Release clause found in the Settlement Agreement states:

> C&C hereby fully releases West and any and all of his respective … licensees … from any and all claims, demands, obligations, controversies, actions, causes of action suits, rights … known or unknown … arising from

> the beginning of time to the date hereof [November 14, 2011], which C&C has, may have had, or may in the future claim to have against any of the West released parties which are based on, arise out of, or related in any way to the Action, the involved patents, or additional patents.

(Dkt. 24 ¶ 5.) Plaintiffs argue that this provision prohibits Defendant from bringing the patent-related counterclaims (Counts II, III, V, VI, and VII). (Dkt. 286 at 14.) In Plaintiffs' view, Defendant's counterclaims challenge the validity and enforceability of the '734 Patent—precisely what the Settlement Agreement sought to prevent in the release clause. Defendant responds that the "counterclaims, as alleged, did not exist as of the date of the release" because they "arose as a result of fraudulent acts of the Plaintiff (and West), made years after the date of the release." (Dkt. 297 at 5.)

Defendant correctly argues that the release clause does not cover all future claims that are in any way related to the '734 Patent. Instead, the general release clause by its own terms prohibits Defendant from bringing counterclaims that could have been brought against Plaintiffs on or before November 14, 2011. Accepting Plaintiffs' interpretation to cover all future conduct that relates in any way to the patents would vitiate the time limitation (November 14, 2011) contained in the contract. Such an interpretation would also run contrary to Illinois public policy. *Washington v. Chi. Bd. of Educ.*, 786 F. App'x 602, 606 (7th Cir. 2019) (quoting *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 286 (2003)) ("Illinois prohibits construing a release to 'include claims not within the contemplation of the parties' or to "cover claims that may arise in the future.' ").

This is not to say that Defendant may bring any counterclaim after November 14, 2011. Defendant's counterclaims are barred to the extent Defendant seeks to

relitigate claims that were brought, or could have been brought, in the previous action. Plaintiffs' brief, however, makes no attempt to disaggregate individual counterclaims that may or may not have been available on or before November 14, 2011. For example, Count VI (non-infringement of the '734 Patent) depends almost entirely on a claim construction order issued by the U.S. District Court for the Northern District of California in 2008 (before November 14, 2011). Yet Plaintiffs do not discuss this fact in their briefing. Because Plaintiffs' argument that the release provision covers all future claims related to the '734 Patent fails, and Plaintiffs make no arguments in the alternative, the motion to dismiss these counterclaims is denied.

*3. Counts I, II, III, and IV Are Dismissed Without Prejudice as Moot*

In view of this Court's holding that the License Agreement terminated on December 24, 2018, Counts I, II, III, and IV of Defendant's counterclaims are dismissed without prejudice as moot. Each of Counts I, II, and III seeks, in effect, a declaration that the License Agreement is no longer enforceable on any date after December 24, 2018. (Dkt. 283 ¶¶ 130, 138, 141.) But the requested relief has already been effectively granted. Count IV also alleges that Plaintiffs breached the License Agreement "[i]f deemed not terminated." But a contract that has already terminated cannot be breached. With no specified relief left to grant, dismissal without prejudice is warranted. If Defendant seeks some other form of relief for actions taken before the termination of the License Agreement on December 24, 2018 it should specify such given the rulings set forth in this Opinion.

4. *Counts VIII and X: Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), Unfair Competition (Missouri and California Law), and Tortious Interference (California Law)*

Counts VIII and X arise from Plaintiffs' alleged representations concerning the '734 Patent, which covers certain tungsten carbide jewelry. Defendant alleges that the patent should have expired at the end of 2018, but that Plaintiffs improperly obtained a certificate of correction from the USPTO in 2019 by removing the patent's previously claimed priority date and terminal-disclaimer language and withholding material prior art. (Dkt. 283 ¶¶ 227–235, 252–256.) Defendant further alleges that Plaintiffs knew the patent was invalid or unenforceable but nevertheless represented to Defendant, Helzberg Diamonds, and others in the marketplace that it remained valid and enforceable through August 2023. (*Id.*) According to Defendant, Helzberg—an existing customer with which Defendant was discussing sales of tungsten carbide rings—declined to proceed after Plaintiffs asserted the patent, causing Defendant to lose the contemplated business. (*Id.*) Count VIII asserts unfair competition under Illinois, California, and Missouri law,[8] and Count X asserts interference with prospective economic advantage under California law.[9]

Plaintiffs argue that the Illinois Consumer Fraud and Deceptive Business

[8] These claims arise under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), Illinois common law, California's Unfair Competition Law, and Missouri common law. A private ICFA claimant must plead an unfair or deceptive act occurring in trade or commerce, the defendant's intent that the claimant rely on any alleged deception, actual damage, and proximate causation. *Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 2024 IL 129183, ¶¶ 26, 38. An ICFA claim may, however, rest on an unfair practice independent of deception. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934–35 (7th Cir. 2010). But federal patent law requires that state-law unfair-competition claims for improper assertions of patent rights include a showing of bad faith and objective baselessness. *See Globetrotter Software, Inc. v. Elan Comput. Grp., Inc.*, 362 F.3d 1367, 1374–77 (Fed. Cir. 2004).

Practices Act ("ICFA") claim fails to state a claim because the USPTO later confirmed the patent's claims in a patent-review action, thereby demonstrating that Plaintiffs' statements concerning the patent were true and made in good faith. (Dkt. 286 at 3–9, 17–18.) In addition, Plaintiffs argue that Defendant was a business competitor and therefore has no standing under the ICFA. (*Id.*) They also contend that the parties' License Agreement selects Illinois law, rather than Missouri or California law, and prohibited Defendant from selling licensed products to Helzberg. (*Id.* at 18–20.) Defendant responds that the patent-review action did not resolve whether Plaintiffs wrongfully obtained the certificate of correction or knowingly asserted an unenforceable patent, and that the alleged interference occurred after the License Agreement terminated. (Dkt. 290 (sealed).)

At this stage, the Court must accept Defendant's well-pleaded factual allegations as true and draw reasonable inferences in its favor. *Iqbal*, 556 at 678–79. Defendant alleges that Plaintiffs wrongfully procured an extension of the patent term, knew the resulting patent rights were invalid or unenforceable, and nevertheless invoked those rights to exclude Defendant from the market and disrupt Defendant's relationship with Helzberg. (Dkt. 283 ¶¶ 227–35, 252–56.) Those allegations plausibly describe both an unfair method of competition and wrongful interference with a probable economic relationship. *See Zenith Elecs. Corp. v. Exzec,*

---

[9] California intentional interference with prospective economic advantage requires an economic relationship carrying a probability of future benefit, the defendant's knowledge of that relationship, intentional acts designed to disrupt it, actual disruption, resulting economic harm, and conduct that is independently wrongful apart from the interference itself. *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003).

*Inc.*, 182 F.3d 1340, 1353–55 (Fed. Cir. 1999) (state-law unfair competition liability may accrue when an individual knowingly asserts that a patent is valid, enforceable, or infringed despite knowing otherwise); *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950, 954 (Cal. 2003) (outlining elements of a California intentional interference with prospective economic advantage claim).

Defendant also sufficiently alleges the claim-specific elements challenged by Plaintiffs. For Count VIII, Defendant alleges that Plaintiffs used the asserted patent rights as an unfair method of competition and that the conduct directly caused identifiable lost sales; those allegations are sufficient at the pleading stage notwithstanding Defendant's status as a commercial entity—even under ICFA.[10] *See Tri-Plex Technical Services, Ltd. v. Jon-Don, LLC*, 2024 IL 129183, ¶¶ 26–38. For Count X, Defendant alleges an existing customer relationship with Helzberg, ongoing discussions concerning additional sales, Plaintiffs' knowledge of that relationship, a direct communication intended to disrupt it, Helzberg's resulting refusal to purchase, and economic loss. *See Korea Supply*, 63 P.3d at 950.

Plaintiffs may ultimately establish that the certificate of correction and the

[10] Plaintiffs are correct that Defendant cannot avoid the ordinary ICFA elements merely by alleging that the conduct affected consumers or the market generally. *See Tri-Plex*, 2024 IL 129183, ¶ 38. But Defendant alleges that Plaintiffs' conduct was directed at excluding Defendant and other competitors from the market, that Plaintiffs represented publicly that only authorized licensees could sell tungsten carbide rings, and that those representations caused Defendant to lose identifiable sales. (Dkt. 283 ¶¶ 227–235, 252–256.) Those allegations plausibly connect the challenged practice to Defendant's own injury and permit an inference of proximate causation. Because Count VIII may proceed on an unfair-practice theory, the Court need not determine at this stage whether every alleged statement also supports a distinct ICFA deceptive-practice theory requiring proof that Defendant itself was deceived or relied on the representation.

patent-review action rendered their patent position truthful and objectively reasonable. But their present argument requires the Court to reject Defendant's allegations concerning how the corrected patent term was obtained, what Plaintiffs knew, and why they communicated with Helzberg. Those are factual matters that cannot be resolved against Defendant on a Rule 12(b)(6) motion. *See Twombly*, 550 U.S. at 556. The License Agreement likewise does not warrant dismissal of any claims because the Court has already determined that it terminated on December 24, 2018, before the alleged interference, and Plaintiffs identify no customer restriction that survived termination. Nor does the License Agreement's Illinois choice-of-law provision, which governs how the Agreement is "construed and interpreted," necessarily govern allegedly *tortious statements* that commented on the purported validity of the '734 Patent, rather than of the License Agreement itself. *See Facility Wizard Software, Inc. v. Se. Tech. Servs., LLC*, 647 F. Supp. 2d 938, 943–45 (N.D. Ill. 2009).

Accordingly, Plaintiffs' motion to dismiss is denied as to Counts VIII and X. Defendant may ultimately fail to prove that Plaintiffs wrongfully obtained the certificate of correction, that the '734 Patent was invalid or unenforceable, that Plaintiffs acted in bad faith, or that the challenged statements caused Defendant's claimed losses, but that possibility must await further development of this litigation.

## IV. CONCLUSION

Defendant's motion for summary judgment on Count I is granted in part and denied in part. Count III is dismissed without prejudice as moot; Defendant's motion

for summary judgment on Count III is therefore dismissed. Plaintiffs' motion to dismiss Defendant's third amended answer and counterclaims is granted in part and denied in part.

SO ORDERED in No. 19 C 7675.

Date: September 28, 2026

JOHN F. KNESS
United States District Judge